Alfred D. HUGHES and El Paso Holding Corporation, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 90–878C.

United States Court of Federal Claims.

June 9, 2006.

John K. Villa, Washington, D.C., attorney of record for the plaintiffs. David S. Blatt, Paul K. Dueffert, Ryan T. Scarborough and Dov P. Grossman, Of Counsel, Washington, D.C.

Marc S. Sacks and Arlene Pianko Groner, Department of Justice, Washington, D.C., with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and William F. Ryan, Assistant Director for the defendant. Delfa Castillo, Cheryl L. Evans, David C. Hoffman, Of Counsel, Washington, D.C.

## OPINION

MEROW, Senior Judge.

This is a *Winstar*-related case. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Rising interest rates in the 1980s led to the insolvency of many savings and loan associations also known as thrifts. To attract deposits, thrifts had been paying interest at rates that far exceeded their income stream from mortgage agreements that had been previously entered into at lower rates. *Castle v. United States,* 301 F.3d 1328, 1332 (Fed.Cir.2002). Liabilities of many of these thrifts exceeded their assets by millions of dollars. Between 1981 and 1983, more than four hundred thrifts declared bankruptcy. Many more were in precarious financial straits. The insurance fund of the Federal Savings and Loan Insurance Corporation ("FSLIC"), the agency then charged with insuring deposits, simply did not have the funds to pay insured depositors. *Winstar,* 518 U.S. at 846–47, 116 S.Ct. 2432 (noting government estimates of some $15.8 billion to close all insolvent thrifts).

The Federal Home Loan Bank Board ("FHLBB" or "Bank Board"), which regulated federal savings and loans, encouraged healthy thrifts and outside investors to purchase insolvent thrifts. *Winstar,* 518 U.S. at 847, 116 S.Ct. 2432; *Franklin Fed. Sav. Bank v. United States,* 431 F.3d 1360, 1362 (Fed.Cir.2005). Transaction structures varied, but the basic idea was that private parties (typically well-managed and financially strong thrifts) proposed to acquired deeply troubled thrifts and persevere thereafter until the economy, particularly the real estate market, improved, and profits could be received on a greater asset base. By this approach, the government saved the cost of holding and liquidating insolvent thrifts and hoped to avoid the billions of dollars estimated to be required to pay off insured depositors.

Some transactions were "unassisted" in that regulators merely approved an acquisition. Others, representing the bulk of the litigation in this court, were "assisted" in that following sometimes extensive negotiations, regulators provided financial and regulatory incentives, cash or other consideration to induce acquisition proposals. Incentives included recognizing regulatory goodwill also known as supervisory goodwill.[1] *Home Sav. of Am. v. United States,* 399 F.3d 1341, 1348–49 (Fed.Cir.2005) (finding holding company was party to a "larger transaction" with standing to sue for breach of government's promise of certain accounting treatment for goodwill). Under federal regulations, the difference between a thrift's assets and liabilities, its regulatory capital, was required to be positive by a certain percentage—here generally three percent. For example, a thrift with assets of $110 million and liabilities of $100 million would have ten percent regulatory capital.

Regulatory capital was the lifeblood of a thrift. Lending restrictions, growth and, indeed, ability to open or remain open for business depended upon maintaining the required level of regulatory capital. Therefore, not surprisingly, the definitions and components of regulatory capital were critical. In many acquisitions, including the instant one, the FHLBB agreed to allow the negative net

---

1. "Supervisory goodwill is the excess of the purchase price paid for a thrift over the fair value of all identifiable assets acquired." *Home Sav. of*

*Am.,* 399 F.3d at 1349 n. 1 (citing *Winstar,* 518 U.S. at 848–49, 116 S.Ct. 2432).

worth of the acquired thrift to "count" toward required regulatory capital, amortized here, over twenty-five years. *Winstar*, 518 U.S. at 849–50, 116 S.Ct. 2432; *Home Sav. of Am.*, 399 F.3d at 1344–45; *Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1370 (Fed. Cir.2001). Indeed, the Federal Circuit observed in *Landmark*, this forbearance was the "primary inducement that the FSLIC offered potential purchasers." 256 F.3d at 1370. The inclusion of this negative sum in regulatory capital is also referred to as "purchase accounting." In some cases, the government provided additional incentives—consideration in the form of capital credits that acquirers were permitted to apply to regulatory capital requirements. *Winstar*, 518 U.S. at 853, 116 S.Ct. 2432. In others, regulators agreed to forbear from enforcing a thrift's regulatory capital requirements for a specified period of time. *See Hometown Fin. Inc. v. United States*, 409 F.3d 1360, 1367 (Fed.Cir.2005); *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1345 (Fed.Cir.2001). And, in some transactions, significant cash was paid by the government into the thrift being acquired.

As the Supreme Court affirmed in *Winstar*, subsequent legislation eliminating previously agreed-upon supervisory goodwill, was a breach of contract. *Winstar*, 518 U.S. at 870, 116 S.Ct. 2432 ("When the law as to capital requirements changed ... the Government ... became liable for breach. We accept the Federal Circuit's conclusion that the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, ... the federal regulatory agencies limited the use of supervisory goodwill ..."). Contracts between the acquirers and the government have been found to exist in many acquisitions; in others, approvals have been found to be regulatory not contractual. Contract terms and documents have varied widely. Generally, however, contracts have been found in several documents as well as negotiations and correspondence between private parties and the government.

Following a July 24, 1987 meeting with federal regulators, representatives of El Paso Federal (a troubled thrift) and plaintiffs' counsel, on August 13, 1987, Alfred J. Hughes ("Hughes"), personally, and El Paso Holding Company ("Holding Company") conditionally agreed to acquire the troubled thrift. In the Agreement and Plan of Merger and Supervisory Conversion (hereinafter "Merger Agreement"), Hughes and the Holding Company proposed to acquire El Paso Federal in exchange for contributions of 14 parcels of real property valued at $47.3 million (net of debt) and $11.5 million.[2] "On or before the Effective Date, **Hughes will cause** partnerships and corporations controlled by Hughes to capitalize [the Holding Company] with certain parcels of real estate ... currently owned by such partnerships and corporations with a [FHLBB] R Memorandum # 41c net appraisal value (after debt) of $47.3 million." (PX 190 at SF1458 (emphasis added).)

El Paso Federal would then convert from a mutual savings and loan association[3] to a state-chartered stock association. The Holding Company would acquire the stock and then merge the thrift into El Paso Savings Association ("El Paso Savings"), a Texas-chartered interim savings association owned by the Holding Company and used to facilitate the transaction. The resulting and surviving thrift would be El Paso Savings Association ("New El Paso"), a wholly-owned subsidiary of the Holding Company.

The Merger Agreement had several conditions precedent, primarily the "[a]mortization of goodwill arising from purchase method accounting, for regulatory purposes, by use of the straight-line method over a 25 year period."[4] (*Id.* at SF 0966, 1090.) This deal

---

2. The source of the cash evolved over time as detailed hereinafter.

3. A mutual association is operated for the benefit of its depositors. *Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613, 615 (2nd Cir.1996); 12 C.F.R. § 544.1 (Charters of federal mutual savings and loan associations provide that "[a]ll holders of the association's savings, demand, or other authorized accounts are members of the association ..." with one vote for each $100 on deposit.).

4. "The obligations of [Hughes and El Paso Holding] to cause the transactions contemplated hereby to be consummated shall be subject to the

could not have happened but for the goodwill forbearance. That goodwill amortization was a condition precedent to the transaction, is highly probative on the issue of the materiality or totality of the breach, discussed hereinafter. Another condition precedent was "[t]reatment for regulatory purposes of contributed assets to be valued at current market value[.]" (PX 190 at SF 1090.)

Several days later, on August 18, 1987, the Holding Company filed an H-(e)1 Application[5] for approval of the merger (required under federal law for a holding company to acquire a thrift). (PX 190.) The Application was signed by Hughes as President of the Holding Company. (*Id.* at SF 0907.) In consideration of the issuance of 1,000,000 shares of stock in New El Paso to the Holding Company, Hughes' personal obligation to infuse assets was repeated:

> Alfred D. Hughes ("Hughes"), the principal organizer of the Applicant, will cause partnerships and corporations controlled by Hughes to capitalize [the Holding Company] with certain parcels of real estate ("Assets") current (sic) owned by such partnerships and corporations. Immediately thereafter, the Applicant will contribute the Assets, with a net estimated appraisal value (after debt) of $47.3 million, to El Paso Savings. The Assets have recent appraisals which conform to Federal Home Loan Bank Board memorandum R–

41(c) or will be in compliance with Federal Home Loan Mortgage Corporation or Federal National Mortgage Association-approved guidelines. Reference is made to the Business Plan attached hereto as Part II to the Application for a more detailed description of the Assets and their contribution to El Paso Savings.[6]

(PX 190 at SF 0917 (emphasis supplied)); *cf. Castle,* 301 F.3d at 1340 (finding individuals who signed the agreements were not personally responsible or required to cause the capital infusions).

The H-(e)1 Application proposed to use the "purchase method of accounting. The fair value of liabilities assumed in excess of the fair value of tangible and identified intangible assets acquired shall be amortized to expense over a period of over 25 years." (PX 190 at SF 0924–25.) "An integral part of this Application is the assumption that the FHLBB will act quickly on this Application and will grant certain regulatory forbearances to the Applicant as a result of its acquisition of El Paso Savings." (*Id.* at SF 0920.) The Application disclosed that Alfred Hughes owned 55% of the shares of the Holding Company and the balance was owned by his son and daughter. (*Id.* at SF 0922.) The Holding Company was a single-purpose entity created to hold the stock of the newly converted and merged El Paso Savings. Hughes, who had prior savings and loan expertise,[7] was the

---

satisfaction on or before the Effective Date of the the following conditions. . . . All . . . forbearances and waivers (including, without limitation, the waivers and forbearances listed on Schedule 6.01), . . . shall have been entered by each regulatory authority having jurisdiction." (PX 190 at SF 0961.)

**5.** H-(e)1 refers to the statutory provision under which holding companies were required to seek permission to acquire thrifts as well as to engage in other activities.

**6.** The parcels were described generally along with their debt and equity:

| Asset | Market Value | Debt | Equity |
|---|---|---|---|
| Income producing property Apartment projects | $ 32.0 | $14.0 | $18.0 |
| Residential-undeveloped Steiner Ranch | 55.7 | 34.5 | 21.2 |
| Commercial Property Waterford Centre | 25.6 | 17.5 | 8.1 |
| | $113.3 | $66.0 | $47.3 |

(PX 190 at SF 0923 (footnote omitted).)

**7.** Hughes' employment history was outlined including his position with Austin Savings Association in branch acquisition and lending, as branch manager and as Vice President of Lending. He later became president of a savings association charter and developed the first major subdivision in Round Rock, Texas. He was involved in 56 separate government-related projects, owning 21 government apartment complexes, comprising some 2,200 separate living units. Through an affiliated company, he headed a 90–person team that managed those complexes. (PX 190 at SF 1108.) He was on the of Interfirst Bank–Austin, also serving on the Credit Policy Committee. In 1986, he was appointed by Texas Governor Mark White to serve on the Board of the Texas Department of Corrections (an agency with over 12,000 employees and an annual budget in excess of

organizer, president, and majority shareholder. (*Id.* at SF 0907 and 0917.) Included with the Application was Hughes' financial statement listing ownership in some 27 properties, 32 partnerships, corporations, and joint ventures in which he previously or currently had an interest; and short and long term obligations. (*Id.* at 1113 *et seq.*)

Under the Business Plan, New El Paso's viability depended on purchase accounting. "The Association will have sufficient capital [after the merger] to achieve a ratio of capital to liabilities in excess of the Association's regulatory capital requirement, which exceeds 3% of total liabilities." (*Id.* at SF 1620–21.) As El Paso Federal's negative net worth kept rising, so did the importance of this condition precedent. The intent of the Business Plan was "to return the Association to profitability through growth and higher interest spreads while managing the risk level in the current loan and investment portfolio." (*Id.* at SF 1626.) The Section 8 apartments [8] to be contributed were projected to have a positive cash flow of $1.8 million annually. (PX 190 at SF 1627.) Less than fee ownership of a portion of Steiner Ranch was disclosed. The 3,750 acres would be contributed to the thrift, and another 750 acres would be held in a joint venture with a third, but related party. (PX 190 at SF 1628.)

Amendment No. 1, filed February 3, 1988, followed "discussions between the applicant and the Appraisal Department of the [FHLB–Dallas], [and] the market value of the real estate to be contributed by applicant to [New El Paso] was adjusted to $35 million (net of outstanding debt)." (PX 272 at 4277.)

In Amendment No. 2, dated March 10, 1988, the $11.5 million originally proposed as a preferred stock purchase was amended to a purchase of subordinated debentures. (PX 289.)

El Paso Federal, the troubled thrift, had a negative net worth of about $17 million, but that number increased to over $46 million by the time the deal closed. The obvious question comes to mind is why would anyone acquire a thrift with a negative net worth of $46 million, and invest over $40 million (real estate equity of $35 million and an additional $11.5 million) to do so? The short answer is the government promised forbearances that would allow the operation and possible consolidation and implementation of efficiencies and growth until the economy, and particularly the Texas real estate market, improved at which time enhanced return on investment was anticipated. Here, unlike many *Winstar* cases in which the government's assistance included cash or cash equivalent contributions, no direct financial contributions were sought or obtained from the government. "It is important to note that El Paso Holding is seeking no financial assistance from the FSLIC in connection with the proposed merger conversion, despite El Paso Federal's financial condition." (PX 190 at WOT 467 0372.)

On May 13, 1988, the FHLBB, approved the Application, declaring the transactions "are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Institution." (PX 338 at 2.) The Approval Letter provided that "[p]ursuant to delegated authority to approve the applications noted herein, the Secretary or an Assistant Secretary of the Board is hereby directed and authorized to issue to the New Institution a letter, effective upon the merger of the Old Institution into the New Institution concerning supervisory forbearances" ("Forbearance Letter"). (PX 338.) Approval was not conditioned upon the execution of a Regulatory Capital Maintenance/Dividend Agreement ("RCMDA") (agreement to limit dividends and to infuse capital into the acquired thrift to restore regulatory capital deficiencies). *Cf. Franklin Fed. Sav. Bank,* 431 F.3d at 1361 n. 1(Fed.Cir.2005) (FHLBB approval conditioned upon RCMDA). A Certificate of Insurance (required for the new thrift to operate) was authorized provided that the Federal Home Loan Bank of Dallas (a regional component of FHLBB) ("FHLBDallas") approved the inclusion of $11.5 million of subordinated debentures in

---

$500 million). He subsequently was elected chairman. (*Id.* at SF 1108–09.)

8. The government guaranteed the rent on these apartments. Occupancy was normally at 100% with no delinquencies. (PX 190 at SF 1628.)

regulatory capital, and that "certain parcels of real estate which have an aggregate net estimated appraisal value (after debt) of $35 million" be conveyed to the new thrift.[9]

Also on May 13, 1988, the FHLBB issued the referenced Forbearance Letter to New El Paso, "directed and authorized in the Resolution, granting several forbearances including the use of supervisory goodwill to be amortized over 25 years." (PX 336.) The Forbearance Letter had several conditions. A RCMDA was not among them.

The Forbearance Letter was signed by the FHLBB's Acting Secretary, and granted six forbearances, including the use of supervisory goodwill and amortization over a 25 year period. While certain forbearances were limited to one or five years, the goodwill forbearance (Item No. 3) was not; rather amortization could be as long as 25 years.

1) [t]he Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period not to exceed five (5) years following consummation of the acquisition ("Effective Date"), from exercising its authority under Section 561.13 of the Insurance Regulations, for any failure of El Paso to meet the net worth requirements of Section 561.13 arising solely from an increase in the contingency factor attributable to El Paso at the date of acquisition.

2) For a period not to exceed five (5) years, from the Effective Date, the FSLIC will forbear from exercising its authority under Section 563.9–8(c)(2)(i) or (ii) or (iii) (Threshold for Equity Risk Investments) of the Insurance Regulations, to allow New El Paso to exclude all investments currently in El Paso's portfolio in determining the amount available for equity risk investments.

3) For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by New El Paso over a period not to exceed twenty five (25) years by the straight line method, from the Effective Date.

4) Not later than one hundred twenty (120) days following the Effective Date, New El Paso shall submit to the Supervisory Agent an independent certified public accountant's opinion that New El Paso has accounted for this merger in accordance with generally accepted accounting principles except as herein provided by the Board, for purposes of reporting to the Board, the value any unidentifiable intangible assets resulting from the merger may be amortized by New El Paso over a period not to exceed twenty five (25) years by the straight line method.

(PX 336.) The Forbearance Letter also reduced certain liquidity determinations and terminated the Supervisory Agreement covering the acquired thrift.

Fifteen days later, on May 27, 1988, the Holding Company and FSLIC signed a RCMDA in which, "in consideration of the FSLIC approving the acquisition of control of El Paso Federal by [the Holding Company]" (which the Bank Board had already done),[10] the Holding Company, agreed to,

---

9. Other conditions of approval were (1) the acquisition and merger occur within 60 days; (2) an opinion letter be given that the acquisition did not generate any tax liability and complied with securities laws; (3) both the acquirer and the troubled thrift agree that no adverse events had occurred since the applications; (4) copies of charters and bylaws are filed; (5) an independent accountant opines that the transaction was consummated in accordance with generally accepted accounting principles, and "specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill;" and (6) resolutions of the Board of Directors of the new institution ratifying applications be provided. (PX 338.) The Forbearance Letter, a copy of which was in the file, was "directed and authorized" immediately effective upon the merger. (PX 336.) These were conditions subsequent in that if a condition was not met, then the Approval and the Forbearance Letter would be cancelled.

10. The RCMDA recited, FSLIC was "a corporate instrumentality and agency of the United States, which is under the operating direction of the Federal Home Loan Bank Board." (PX 354 at HS100379.) In *Hansen Bancorp. v. United States*, 67 Fed.Cl. 411, 421–22 (2005) the court declined to "opine about the legal consequences of this inconsistent treatment by the two cognizant agencies," referring to two forbearance letters by two federal agencies, one of which was unqualified and absolute (in which case the government agreed to bear the risk of regulatory or statutory change), and the other qualified (in

"[a]s long as the [Holding Company] controls [New El Paso], the [Holding Company] will cause the Regulatory Capital of [New El Paso] to be maintained at a level [11] at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement and cure a Regulatory Capital Deficiency during the first quarter after which [New El Paso] fails to meet its Regulatory Capital Requirement." (PX 354 at 0380.) The Holding Company also agreed that it would not accept, and New El Paso would not pay, dividends in excess of fifty percent of the thrift's net income. The RCMDA did not contain an integration clause; did not incorporate any other document; and did not include Hughes as a party.

On September 9, 1988, FHLB–Dallas concluded the approval conditions had been met. Upon closing of the sundry transactions, New El Paso had regulatory capital of $46.5 million, consisting primarily of the negative net worth of the acquired thrift. (PX 446.)

Despite literally more than one hundred private acquisitions of troubled thrifts with some form of government assistance and/or forbearances, the savings and loan crisis continued. On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 101 Stat. 183 ("FIRREA") ostensibly to attack the causes of the crisis and restore public confidence. *Winstar*, 518 U.S. at 856, 116 S.Ct. 2432. After FIRREA and its implementing regulations, supervisory goodwill could no longer be included in computing regulatory capital. "FIRREA greatly reduced the amount of supervisory goodwill that could be used to meet regulatory capital requirements." *Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed.Cir.1995) (citing 12 U.S.C. § 1464(t)); *see also* 12 C.F.R. § 567.1(w) (1990) (restrictively defining the amount of supervisory goodwill that qualified for regulatory accounting). Regulators demanded substitute capital be infused into New El Paso, and because of its imputed regulatory capital deficiency, New El Paso was subject to stringent operating restrictions.

In summary, as details are related in the discussion of materiality, causation and foreseeability, *infra*, New El Paso was unable to meet FIRREA's new capital requirements. On December 1, 1989, regulators informed New El Paso that it would be out of capital compliance on December 7, 1989 and a capital restoration plan was required. (PX 660 at 0976.) New El Paso's case manager noted in February of 1990 that the thrift's "failure" to meet capital "requirements [was] largely the result of goodwill on [New El Paso's] books which equaled approximately $42,491M (sic) as of October 31, 1989." (PX 702 at 1235.) On June 11, 1990, the Office of Thrift Supervision ("OTS") informed the Holding Company that New El Paso had not been in compliance with its regulatory capital requirements since December 7, 1989. (PX 757; DX 1421.) Demand was made on the Holding Company to make up the approximately $47,407,000 capital deficiency. On July 2, 1990, the Commissioner of the Texas Savings and Loan Department placed New El Paso in a conservatorship, citing several reasons, the first of which was failure to meet federal regulatory capital requirements.[12] (PX 763.) On August 2, 1990, OTS directed New El Paso "to *immediately* discontinue including supervisory goodwill in

which case the acquirer may have agreed to bear the risk of such change.).

11. Indeed, the Office of General Counsel's Memorandum to the FHLBB on this acquisition noted the recommendation of the Office of Regulatory Policy Oversight and Supervision ("ORPOS") for a "standard" RCMDA. "The 'standard' agreement require[s] a holding company to agree to maintain the Association's regulatory capital at the levels required by Section 563.13 of the Insurance Regulations, and to limit the payments of dividends to an amount not to exceed 50 percent of the Association's net income from the prior year." (PX 343 at 11 (emphasis added.)); (*see also* PX 259 at 15 (memorandum from Principal Supervisory Agent George Barclay to Linda Plye, Director, Corporate Activities, Office of Regulatory Policy, Oversight and Supervision recommending approval of the acquisition subject to several conditions including a RCMDA).)

12. Plaintiffs contend that the other reasons listed would not have supported a conservatorship and that it was the regulatory capital deficiency that prompted the State of Texas Conservatorship.

the amount of approximately $41.5 million, or in any other amount, in its core capital calculation ...." (PX 769; DX 1442.) On September 7, 1990, OTS placed New El Paso in a receivership for the same reason. (PX 785; DX 1458.) Also because of its capital deficiencies, significant operating restrictions were imposed. New El Paso was subsequently liquidated.

**Liability for breach of contract established**

The court previously granted plaintiffs' Motion for Summary Judgment on Liability, finding (1) the parties entered into a contract that included the government's promise that the $44 million in negative net worth of the acquired thrift, amortized over a period not to exceed twenty-five years, would count as regulatory capital; (2) both Hughes and the Holding Company were parties to that agreement; and (3) FIRREA was a breach. *See Hughes v. United States,* 58 Fed.Cl. 291, 301 (2003) (*"Hughes I"*). *Hughes I* contains findings and conclusions on contract formation, which will not be repeated here. This opinion also rejected the government's argument that the Holding Company agreed to bear the risk of regulatory change concerning supervisory goodwill. *Id.* at 305–07. Following the Federal Circuit's opinions in *Admiral Financial Corp. v. United States,* 378 F.3d 1336 (Fed.Cir.2004), and more recently *Franklin Fed. Sav. Bank v. United States,* 431 F.3d 1360 (Fed.Cir.2005), the court revisits that determination.

For damages, plaintiffs seek the return of $35 million in equity in the 14 contributed properties and $11.5 million paid to the thrift for the purchase of subordinated debentures. The government contests the recited value of these contributions and also asserts: (1) any values must be offset by the benefits conferred on plaintiffs both at the time of contracting and during the more than one year plaintiffs "got" to operate New El Paso; (2) FIRREA was not a material, substantial or total breach; and (3) New El Paso would have failed anyway; therefore, any return of the value of these contributions would be an impermissible windfall.

*Hughes I* found FIRREA and its implementing regulations eliminated the condition precedent to this acquisition—the supervisory forbearance in the Approval Letter. 58 Fed.Cl. at 301 ("The contractual agreement authorizing the use of purchase method accounting and its amortization over a 25 year period was breached by FIRREA.... FIRREA prevented New El Paso from using its supervisory goodwill in meeting its minimum regulatory capital requirements."). To be sure, as the Supreme Court explained in *Winstar,* regardless of contractual commitments, the government has the unfettered right to amend statutes and regulations. However, when those amendments contravene contractual commitments, the government is liable for breach and its recompense. *Winstar,* 518 U.S. at 869–70, 116 S.Ct. 2432. FIRREA breached plaintiffs' agreement with the government. In return for $35 million in real property and $11.5 million to purchase subordinated debentures of the new thrift, plaintiffs agreed to acquire El Paso Federal, a troubled thrift. The acquisition relieved the government from having to take over and liquidate the thrift and pay off insured depositors. The material, substantial and primary consideration (indeed a condition precedent) was the long-term amortization of supervisory goodwill. As damages for the government's breach, plaintiffs seek to be returned to their pre-agreement condition—return of their initial investments of $35 million in net equity in real estate contributed and $11.5 million for purchase of subordinated debentures.

Following a seven-week trial on damages, extensive post-trial briefing including plaintiffs' initial submissions of 375 pages with a 177 pages initial response by the government, and numerous additional and supplemental submissions, after consideration, the court concludes that (1) FIRREA's breach was material, substantial and total; (2) plaintiff Hughes is entitled to the value of the required contributions as reliance or restitution damages; (3) no offsets were established; (4) no tax gross-up is warranted at this time; (5) Hughes did not agree to bear the risk that the government could unilaterally eliminate supervisory goodwill. However, following Federal Circuit precedent, the court finds the Holding Company agreed to

bear the risk of regulatory change and cannot, therefore, recover damages.

### Conveyance of title and valuation of the properties

■ The government argues that plaintiffs are not entitled to restitution/reliance damages for the value of the 14 contributed properties because plaintiffs did not "contribute" them; rather they were conveyed by related third-parties not in contractual privity with the government.[13] The government also contests the aggregate valuation of $35 million equity (net of debt) recited in contract documents, protesting that number was really not agreed-upon, and even if it were, any restitution or reliance damages for breach should be the net realizable equity ("NRE") the plaintiffs would have received from the sale of these properties (basically, sales price less costs of sale, handling costs, taxes, etc.) such that the "real" value of the $35 million in equity was (or is) $4.1 million. Also, plaintiff Hughes' contribution/purchase of $11.5 million in subordinated debentures was a paper transaction, not a value, cost, or benefit to be "returned" because of the government's breach.

Plaintiffs respond that all 14 parcels were conveyed to New El Paso. Plaintiffs "caused" the conveyances, which aside from disputes concerning valuations, the government admits were made. Entities controlled by, or related to, Hughes or the Holding Company made the conveyances—details disclosed to, and acknowledged by, regulators. Hughes was contractually responsible for causing the properties to be contributed to the thrift, was required to do so and did do so. That is all that is required. Secondly, valuations in the contracting documents were informed, negotiated and agreed-upon by the government, providing the framework for the court's damage analysis, values that are independently supported by appraisal testimony.

Amendments and regulatory documents confirm that Hughes was personally responsible for the contributions, and that a negotiated equity amount was part of the deal. A January 20, 1988, FHLB–Dallas summary of the proposal from George Barclay, Principal Supervisory Agent to Linda Plye, Director, Corporate Activities, ORPOS, stated that "Alfred D. Hughes ('Hughes'), the principal organizer of [the Holding Company], will contribute partnerships and corporations he controls to capitalize [the Holding Company] with certain parcels of real estate ... with a net estimated appraisal value (after debt) of $35,000,000." (DX 464 at WON989 0087.) "Equity interest," based on the "appraised value" of each of the 14 properties less debt was delineated. (*Id.*) ("The following properties are being contributed by Mr. Hughes as part of the recapitalization of El Paso Federal.")

| Property | Equity Interest |
| --- | --- |
| Waterford Center | $ 8,100,000 |
| Steiner Ranch | 13,400,000 |
| Twelve Section 8 Apartments | 13,500,000 |
| | $35,000,000 |

The appraised value of the Section 8 apartments are as follows:

| | |
| --- | --- |
| Springdale Apartments | $ 1,700,000 |
| Walnut Manor Apartments | 1,030,000 |
| Mason Manor Apartments | 2,735,000 |
| New Light Apartments | 3,950,000 |
| Sir John Apartments | 1,575,000 |
| Redwood Apartments | 5,000,000 |
| Robin Square Apartments | 2,700,000 |
| Trinity Garden Apartments | 2,750,000 |
| La Hacienda Apartments | 1,175,000 |
| Palacio Real Apartments | 2,690,000 |
| Neptune Apartments | 440,000 |
| Roswell Apartments | 1,170,000 |
| | $26,915,000 |

13. In return for their conveyances, Old El Paso issued one million shares of common stock to Al Hughes, Lance Hughes, Brenda Hughes and Scott Gregson. These individuals then exchanged those shares for shares in the Holding Company. In the end, the Holding Company owned Old El Paso. The one million shares of common stock in Old El Paso were cancelled and Old El Paso merged into New El Paso. The corporate formalities should be maintained the government argues, because most of the conveyances were to have gone through the Holding Company (but many did not), having availed themselves of the corporate protections of the Holding Company, Hughes, his family and associated entities should not be allowed to pierce that corporate veil.

*(Id.)*

Regulators were concerned about the Section 8 projects because their value depended in large measure upon government subsidy. Cognizant of Hughes' experience in managing these properties, negotiations over the value of the Section 8 properties led to Hughes' personal guarantee of annual net cash flow of $1 million, his agreement to continue to manage these properties, to limit dividends and not to sell for less than their book value:

> In connection with the supervisory conversion application filed by [the Holding Company], the controlling stockholder of [the Holding Company], Alfred Hughes, has agreed to contribute his interests in 12 federally subsidized low income apartments mentioned above. In order to provide assurance of the creditworthiness of these properties to the Federal Home

Loan Bank of Dallas, Mr. Hughes has agreed to execute a guarantee that the cash flow from the properties shall not be less than $1,000,000 per fiscal year. Cash flow is defined as the total funds generated annually by the operation of the properties less the debt service costs.

> Mr. Hughes further agrees not to sell any or all of the properties for an amount less than the book value of such property or properties without the prior written consent of the Supervisory Agent.

*(Id.* at WON989 0088.) This guarantee refers to Hughes as an "Applicant." [14]

Amendment No. 2, included a change from $11.5 in preferred stock to $11.5 in purchase of subordinated debentures—$10 million were being purchased by Steiner entities and $1.5 million would be purchased by Hughes individually.[15] The Amendment also responded to ORPOS comments as to the na-

---

**14.** In connection with the supervisory conversion application filed by Alfred D. Hughes and El Paso Holding Company to acquire El Paso Savings Association ("Obligee"), Alfred D. Hughes ("Obligor") has agreed to contribute to Obligee his interests in twelve (12) federally subsidized low income apartments . . . .

> 1. Obligor agrees to undertake the following obligation:
> A. For each of the next ten (10) fiscal years of the Obligee commencing with the fiscal year 1988, Obligor guarantees that the Combined Cash Flow from the properties shall not be less than One Million Dollars ($1,000,000) per fiscal year.
> B. Obligor agrees to provide management services for the Properties during such time as the Obligor owns the Properties at rates currently authorized by the respective housing authorities. In the event that the FHLBB removes the Obligor from the management of any Property or Properties (i) the obligations of the Obligor hereunder as to each respective Property or Properties shall cease; and (ii) the Obligor, Obligee and the Supervisory Agent of the FHLBB shall mutually reduce the Combined Cash Flow to reflect the cessation of Obligor's obligation as to each respective Property or Properties.
> . . . .
> 7. To the extent necessary to insure compliance of Obligor with the Obligations stated in paragraph 1 above, the FHLBB shall have the right but not the obligation to enforce the Obligor's Obligations hereunder on behalf of the Obligee. The FHLBB joins in this Agreement of Obligation for the sole purpose of acknowledging its enforcement right and for

no other purpose whatsoever and by its execution hereof assumes no liabilities or obligations of the Obligee hereunder.
(PX 354, Tab 45 at HS100436–37.)
Hughes built 56 government-subsidized projects. After the conveyances here, he still retained 22 projects consisting of approximately 2,200 separate units. (Tr. at 1594:22–1596:35 (Hughes).)

**15.** In his individual capacity, Hughes would purchase $1.5 million of Series B subordinated notes issued by New El Paso. New El Paso would also issue $10 million of Series A subordinated notes to retire a portion of the related debt on the Steiner properties. According to the May 1988 internal OGC (Office of General Counsel) memoranda, "T.C. Steiner and Son, a Texas General Partnership and Steiner and Sons, Ltd. (the 'Steiner Partnerships') will purchase 100,000 shares of the Series A subordinated debt for an aggregate purchase price of $10,000,000 in cash." (PX 343 at 3.) (T.C. Steiner and Son and Steiner and Son, Ltd. are controlled by Mr. Tommy C. Steiner, who had been a business partner of Hughes.) Instead of receiving $10 million cash, New El Paso paid out $10 million less than it otherwise would have paid to retire the debt on the contributed properties. In other words, the Steiner debt was $21.5 million. However, New El Paso only paid out $11.5 million. On May 27, 1988, Hughes executed a promissory note payable to Mr. Steiner for the remaining $10 million. New El Paso would loan $34.4 million to a newly formed subsidiary to develop the Steiner Ranch property. Bottom line there was full disclosure—whether setoff or cash from one pocket into another—the result is the same.

ture of Hughes' interests in the 14 properties to be contributed.[16] The preclosing March 10, 1988 response is stark evidence of the government's initial curiosity that prompted the inquiry, and subsequent knowledge that the properties were then owned by several entities, but that Hughes was obligated to effect their contribution. Ownerships of the fourteen properties to be contributed were:

| | |
|---|---|
| Palacio Real Apartments | Technical Properties [17] |
| Neptune Apartments | Technical Properties |
| New Light Apartments | Technical Properties |
| Redwood Gardens | Technical Properties |
| Sir John Apartments | Technical Properties |
| Trinity Apartments | Technical Properties |
| Robin Square Apartments | Challenge Properties [18] |
| Roswell | Alfred J. Hughes |
| Mason Manor | Alfred J. Hughes |
| Springdale Gardens | Alfred J. Hughes |
| Walnut Manor | Alfred J. Hughes |
| Hacienda | Brenda Hughes Management Trust |
| H & G Properties, Ltd. | H & G Properties, Ltd.[19] |
| Steiner Ranch, Ltd. | Steiner Ranch, Ltd.[20] |

(PX 289 at SF 6691.)

Amendment No. 3 dated March 22, 1988 responded to additional comments from OR-POS and OGC concerning ownership of the properties to be contributed. (PX 300 at WON989 1747.) In detailed candor, Mr. Hughes' pre-closing letter to Ms. Goings, of ORPOS, responded to her query concerning Steiner Ranch, and answers the government's belated complaint that the type of ownership of Parcel A was either hidden or not disclosed:

As described in the Business Plan,[21] the two parcels of Steiner Ranch, Parcel A representing 752 acres and Parcel B representing 3711 acres, comprise the entire Steiner Ranch holdings of the Applicant. Attached is an exhibit indicating the relative locations of each parcel. Fee title to Parcel B is to be contributed into the institution and subsequently into New Sub, while Parcel A will be contributed and held in (sic) Joint Venture. Parcel B is to be contributed to the institution and the recognized equity will serve as a component of regulatory capital. Parcel A will be contributed through the conveyance of an eighty percent partnership interest owned by the Applicant.

(PX 300 at 1748.)

ORPOS, again prior to closing of this transaction, recognized that Hughes did not own the properties being contributed, and asked about the consideration for the conveyances into the surviving thrift. Also implicit in this exchange is that Hughes was personally responsible for and was arranging for the contributions.

| | |
|---|---|
| ORPOS COMMENT No. 3. | Amendment No. 2 discloses that Mr. Hughes does not have 100% ownership in the (14) parcels of real estate. What consideration |

16. "The Applicant states Mr. Alfred Hughes will cause partnerships and corporations he controls to capitalize the proposed holding company with his interest in (14) parcels of real estate. Please specify exactly what Mr. Hughes's interest is in each of the (14) parcels of real estate." (PX 289 at SF 6690.)

17. As described in the chart of enumerated properties, Technical Properties was a general partnership with the following owners and ownership shares: Alfred D. Hughes, 26%; Patricia Hughes, 26%; Brenda Hughes Management Trust, 24%; and Lance Hughes Management Trust, 24%.

18. As described in the chart of enumerated properties, Challenge Properties was a general partnership of Alfred D. Hughes and Patricia Hughes with 70% and 30% ownership interests respectively.

19. As described in the chart of enumerated properties, H & G Properties, Ltd. was a limited partnership consisting of: Alfred D. Hughes, 74%; Brenda Hughes Management Trust, 10%; Lance Hughes Management Trust, 10%; J. Scott Gregson, 5%, and Brenlan Corporations, 1%.

20. As described in the chart of enumerated properties, Steiner Ranch, Ltd. was a limited partnership with the following owners and ownership shares: Alfred D. Hughes, 55%; Brenda Hughes Management Trust, 20%; Lance Hughes Management Trust, 20%; and Scott Gregson, 5%.

21. As part of the Application, Hughes and the Holding Company submitted a three-year Business Plan "to return the Association to profitability using prudent lending and deposit growth techniques" through growth including the purchase of "mortgage backed securities," "diversification of lending operations," and "branch deposit acquisitions." (Pls.' PFF 90.)

will be received by the individuals and trusts in exchange for this transfer of ownership? Provide evidence verifying that the ownership of the trust can be transferred.

*Response:* Attached please find a letter from Thomas Hill, Esq. which: (i) discusses the consideration to be received by the beneficiaraies (sic) of the trusts in exchange for the transfer of the real estate; and (ii) opines as to the tranferrabiliy (sic) of the ownership of the trust.

(PX 300 at WON989 1778.) The referenced letter from counsel opines that Hughes, and his wife (and co-trustee), Patricia Henderson Hughes, had the authority to transfer property to their children, the beneficiaries of the Trust, who in turn, both being adults, could then convey to the Holding Company in return for stock in the Holding Company. (*Id.* at WON989 1779.) The disclosure of consideration assuages any concerns that the transferors were not compensated or that plaintiff(s) would reap a windfall. Hughes had the capability and apparently did "cause" the contribution of said properties to the thrift.

Amendment No. 3 also described Hughes as causing the contributions of real estate.

At the Acquisition Date, all of the following events will occur:

1. Partnerships and corporations controlled by Alfred D. Hughes will contribute the Steiner Ranch with the Related Debt to El Paso Holding Corporation ('El Paso Holding'). Immediately thereafter, El Paso Holding will convey Steiner Ranch to El Paso Federal as part of the consideration paid for the stock of El Paso Federal by El Paso Holding.

(PX 300 at WON989 1783.)

There is no question that the properties were contributed. There is no suggestion of any windfall, nor does the government complain that it may have to pay twice. Given that the contributions were made in the late '80s, passage of time obviates that concern. Arguing plaintiffs did not hold title to all the properties, the government seeks to foreclose any damages in this case despite the fact that the government breached its promise. The court declines to reach such a result. *See Restatement (Second) of Con-* *tracts* § 346, cmt. a (1981) ("Every breach of contract gives the injured party a right to damages against the party in breach" unless "[t]he parties ... by agreement vary the rules"); 3 *Farnsworth, Contracts* § 12.8, p. 185 (1990) ("The award of damages is the common form of relief for breach of contract. Virtually any breach gives the injured party a claim for damages"); *Winstar,* 518 U.S. 839, 886, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

That the property title holders other than Hughes have not sought restitution is understandable. Lacking obligatory privity, they cannot recover their "contributions." In *Castle,* 301 F.3d at 1338, the Federal Circuit denied individuals Harlan and Castle restitutionary damages of the value of contributions made by third parties because neither Harlan nor Castle were contractually required to make those infusions. "The documents comprising the alleged contract ... contain no promise by Castle and Harlan to recapitalize [the thrift] in their individual capacities." 301 F.3d at 1340.

> John K. Castle and Leonard M. Harlan as individuals will form a new entity [ ] into which the present [association] [ ] will be merged. New Western Empire will issue up to $ 10 million of perpetual Senior Preferred Stock to an investor group *organized by Castle Harlan, Inc.* in order to recapitalize the association ....

*Id.* "[Under the contract documents] neither plaintiff promised to be individually responsible for ensuring that [the thrift] was adequately capitalized." *Id.* In contrast, here Hughes was contractually required to and did obtain the infusion of the 14 properties. "Alfred D. Hughes ('Hughes'), the principal organizer of the Applicant, **will cause partnerships and corporations controlled by Hughes to capitalize [the Holding Company] with certain parcels of real estate ('Assets') current (sic) owned by such partnerships and corporations.**" (PX 190 at SF 1458 (emphasis added).)

Plaintiffs' ability to receive money-back reliance/restitution is unaffected by the source of the consideration where the non-breaching party is required under the contract to make the contributions and they are made. "It is

inconsequential that Westfed chose to borrow the funds from investors to acquire [the troubled thrift's] shares rather than use its own money." *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1368 (Fed.Cir.2005). No claims of financial recompense were suggested, and none would be expected given the interlocking ownerships. Moreover, plaintiffs are clearly in privity of contract with defendant and to the extent any former owner of contributed property were to seek a share of the proceeds of this litigation, this would be a matter between the plaintiffs and the former property owner and not relevant to the present litigation. This court would not have jurisdiction over such a claim. *Rolls–Royce, Ltd. v. United States*, 176 Ct. Cl. 694, 698–99, 364 F.2d 415, 418 (1966).

**The contributed properties**

The following description of the contributed properties underlies the court's findings of their value, plaintiff(s)' ability to cause their contribution, and the government's defenses of nondisclosure, mismanagement, offset and windfall.

### 1. Waterford Centre

In 1987, Waterford Centre, an approximately 40 acre commercial parcel located 7 miles northwest of Austin, Texas, consisted of two parcels. The first was 33 acres including nine commercial lots. The second parcel of 7 acres was leased for 60 years to Healthcare Austin, which planned to build a hospital on the site. The lease included a purchase option that made it economically advantageous to purchase the property in ten years. Excluded was a 2.2 acre parcel previously sold in 1986 to Austin Beverly Heritage ("ABH"), a hotel developer.

The Waterford Centre parcel had been partially developed, and as of May of 1988, approximately $17 million had been spent on development. The appraisal submitted to the regulators with the Application valued Waterford Centre at $25.6 million consisting of (1) the value of the fee simple interest in the 33 acre tract ($12.6 million) and (2) the residuary interest of the 7 acre tract leased to HCI ($13 million). (PX 1, 2.) The appraisal conformed to FHLBB appraisal regulations, including FHLBB Memorandum R–41c.

Regulators also valued Waterford Centre at $25.6 million. (PX 55; PX 259.) Lewis, plaintiffs' expert appraiser, performed a retrospective appraisal of the Waterford Centre, opining it was worth approximately $24 million as of December 1987 when the parties met and agreed on valuations. (Tr. at 4134:3–10.) Mr. Hendricks, the government's expert witness, did not dispute that valuation. (Tr. at 6969:2–21.)

### 2. Section 8 Apartments

Contributed properties also included twelve Section 8 apartment projects with government-guaranteed rents. (Tr. at 1657:6–25.) Tenants pay a percentage of that rental amount, depending on their income level; the government pays for the rest. (Tr. at 1657:6–1658:6.) These contracts had 15 year terms and renewal was generally *pro forma*. (Tr. at 6480:22–6481 and Tr. at 1659:5–1660:15.)

These twelve projects had annual cash flow of more than $5 million. (Tr. at 569:18–22; Tr. at 1660:16–20; PX 232–233.) In considering plaintiffs' application, regulators classified Hughes' management as "excellent," "appears very competent and well organized" and required Hughes' company continue to manage these apartments. (PX 84 at 1; PX 353.) The appraisals Hughes submitted with his application in 1987 valued these properties at approximately $32 million. (PX 14–16, 28–46.) Regulators at the time of this transaction valued the 12 apartments at $26.915 million. In 1984, Hughes received an offer from one of the nation's largest developers of low-income housing to purchase all 12 apartments for approximately $46 million. (PX 913.) Mr. Lewis, plaintiffs' expert witness, appraised these properties at approximately $25 million. (Tr. at 4140:15–4155:21; 4165:14–4171:11.)

### 3. Steiner Ranch

Steiner Ranch was 4,500 acres located in hill country 15 miles west of Austin, Texas. There was considerable testimony about its value as mixed-use, primarily subdivision development. The ranch had several miles of

lake frontage on Lake Austin and other lots had lake views. Fast-forwarding from the acquisition, FIRREA's breach, and the ultimate take-over of El Paso Saving, it is noted, but *not* considered with respect to valuation in this matter, that subsequent development of ranch property flourished with $500,000 homes being constructed.

Specifically, Steiner Ranch consisted of two parcels with different ownership structures. Tract B, consisting of 3,711 acres was slated for mixed-use development. This parcel included 4½ miles of lakefront property on Lake Austin (where there are now some of the most expensive homes in Austin), frontage on Market Road 620, an important thoroughfare in Austin, and approximately 1,000 acres slated for golf course development surrounded by upscale homes. (Tr. at 539:6–540:14; 3863:24–3864:3; 3858:19–3859:17; PX 7 at 7938; PX 63 at 1643, 1657; Tr. at 1761:13–23; 3871:22–3872:3.) Tract A was approximately 752 acres of undeveloped land, planned for immediate phased residential subdivision development. Water and electricity were in place with a preliminary plat with more than 4 lots per acre. (PX 7.) The proposed contribution of Tract A was the right to 80 percent of the profits from the joint venture that held title to Tract A. (PX 255 at 2; PX 300 at 1747, 1751 ("Parcel A will be contributed through the conveyance of an 80% partnership interest owned by Applicant")); (PX 326 at 1000; Tr. at 5066:2–25 (Coile); Johnson Dep. 137:17–25, 146:21–147:7; Goings Dep. 3367:20–337:1, 338:5–10, 338:14–18, 357:8–11.)

The appraisal submitted with the Application valued Tract A at approximately $15 million and Tract B at $55.7 million. (PX 7–13.) Regulators at the time of the transaction valued Tract B at $47.9 million. (PX 255; PX 259.) Handwritten notes from late 1987 indicated the Chief Appraiser of the FHLB–Dallas Appraisal Department had internally valued the 80% profit interest in Tract A at 80% of $12 million, or $9.6 million. (PX 252; Tr. at 5202:19–5203:9.) Mr. Lewis, plaintiffs' expert appraiser's valuation for Tract B was approximately $45.9 million at the time of the transaction. (Tr. at 3958:17–3964:6, 4185:23–4186:5.)

One of the government's counters to the agreed-upon equity valuation of the contributed properties, particularly Steiner Ranch, Tract B, was that the $22 million cost to accelerate an option on that parcel represented the market value of that tract. The court declines to make such a finding. The $22 million was the price of removing an encumbrance, not the fair market value of what was contributed to the thrift. A little history of some other than basic real estate encumbrances is required. Through sundry circumstances, in 1981, Tommy Steiner sold a 250–acre tract to Jim Monaghan for $5,000 an acre. Steiner also granted Monoghan a five-year option to purchase the balance of the ranch in a single purchase of $5,000 per acre the first year, accelerating $500 each year until the price was $7,500 per acre in 1986, the final year of the option. (PX 136 at 1; Tr. at 1610:4–9; Tr. at 508:6–509:4; Steiner Dep. 55:16–19, Aug. 23, 1991; Steiner Dep. 17:4–11, June 27, 1997.) The plot thickened. Steiner's father was very upset because he thought the option price was too low—thought he could have obtained $15,000 or $20,000 per acre. Steiner then placed an oil and gas lease on the ranch, thinking it would prevent the exercise of the option. (Pls.' PFF 41.) Yet, even with that lease, the 1981 option had considerable value and was sold several times before being acquired by two Austin developers—John Watson and John Simmons. (Steiner Dep. 56:1–22, Aug. 23, 1991; Steiner Dep. 19:15–20:17, June 27, 1997; Tr. at 1610:10–11; Tr. at 511:13–25.)

In 1985, Hughes was brought into the 1981 option by Watson and Simmons to renegotiate and extend the 1981 option. Watson and Simmons were relegated to a non-controlling, limited partner role. (Tr. at 1613:22–1614:7, 1616:20–1621:4.) Before negotiating with Steiner, Hughes was approached by the Bass Brothers—investors from Fort Worth, Texas—to enter a joint venture to develop the ranch. In the end, Steiner rejected Bass' offer of $32 million cash, deciding to joint venture with Hughes instead, anticipating a share in the profits which he thought at the time would be around $45 million. (Pls.' PFF 46–48.)

With this history, in early 1985, Hughes renegotiated the 1981 option with Steiner. The agreement was memorialized on the back of Purina Horse Chow stationery. (Tr. at 525:6–19: 922:24–923:3.) Numerous agreements were signed which significantly changed the 1981 option. (Pls.' PFF 49–70.) The oil and gas lease was lifted; the total take-down was eliminated, meaning the option could be exercised for less than the whole parcel; and financing was arranged including cross-collateralization of financing on parcels on which the option was exercised to other parcels. Steiner Ranch Development Corporation ("SRDC") would develop Tract A and Steiner Ranch Limited ("SRL"), a limited partnership, owned the option. (Pls.' PFF 51.) To finance the development, Hughes obtained a $30 million line of credit and an $18 million option line of credit from Bright Banc Savings Association ("Bright Banc"). Hughes remained personally liable on both Bright Banc loans. Profits from development were not expected until later years of development—estimated to be the last 40% of development. (Pls.' PFF 61.) In the end, Hughes was in control of the option and the development. (Pls.' PFF 58.)

In 1986, SRDC purchased the fee interest in the 750 acre Tract A (considered to be more developable with maximum density lower-priced homes). (Pls.' PFF 64.)

That purchase left Tract B, subject to the option/profit sharing agreement. In early 1987, Steiner and Hughes arrived at an accelerated option price for Tract B—a lump sum in lieu of payments over the period of the renegotiated option and profit-sharing. Under the 1985 option, the total to acquire Tract B was calculated at approximately $27.8 million (at 750–acre increments at $7,500 per acre). For various reasons, Steiner agreed to a $22 million price that was roughly the present value of the future income stream. (Pls.' PFF 64–70.) As a result, Hughes acquired the right to accelerate the option to acquire Tract B for $22 million. Hughes had no obligation to accelerate the option; he retained the right to proceed under the 1985 option in 750–acre increments at $7,500 per acre, or $27.8 million. (Pls.' PFF 69.) The government's assertion that the

$22 million is (or was) the market value for the property is accordingly rejected.

**Valuations of the properties**

While regulators certainly preferred troubled thrifts be acquired with cash rather than real estate, which lacks liquidity and has fluctuating values, contribution of real estate was not uncommon during this time of thrift failures as regulators sought to avoid industry collapse. Satterfield, the most senior regulator at the FHLB–Dallas who was personally involved in this acquisition, was also involved in some 100 other thrift acquisitions during the 1987–1989 time frame, a number of which were made with non-cash contributions. Other regulators testified contribution of real estate was not unusual despite risk and uncertainty. (Pls.' PFF 93.)

Understandably, the values of the properties proposed for contribution were a major concern of FHLB–Dallas. The appraisal department of FHLB–Dallas performed the "highest" level of review—an "evaluation." The Hughes appraisals were first reviewed at the "desk" level, then field reviews were conducted—including a physical examination of the parcels and analysis of market data. Short of conducting an independent full appraisal (and the Dallas office had performed a full appraisal on only one occasion), these 14 contributions received the highest level of scrutiny. Indeed, Professor Barry, testified that in more than the half-dozen *Winstar*-related cases in which he was called as an expert witness, several of which involved real estate contributions, he knew of no instance of higher regulatory appraisal review. (Pls.' PFF 100.)

There was considerable discussion between FHLBB and FHLB–Dallas about the properties. Concerns were expressed and addressed. FHLBB relied on the Dallas office to value the properties. In mid-1987, Mr. Coile, the Chief Appraiser of FHLB–Dallas, and his appraisal staff reviewed the appraisals submitted with the Application and were not satisfied. (Pls.' PFF 101–103.) A meeting was held on October 1, 1987 between six appraisers from FHLB–Dallas, Hughes, Gregson, and the private appraisers who had prepared the submittals. As a result of this meeting, Hughes' private appraisers amend-

ed their appraisals several times, submitting them to FHLB–Dallas. The FHLB–Dallas review of the revised appraisals were then submitted for supervisory review. (Pls.' PFF 104; PX 55; PX 86; PX 100; PX 117.)

Following the October 1, 1987 meeting, FHLB–Dallas supervisors requested Coile and his staff go beyond appraisal review and conduct "evaluations" on the 14 parcels—an atypical request in a supervisory conversion. Coile and his appraisal staff personally inspected and independently analyzed each of the 14 properties, including its condition, location, maintenance, occupancy levels, rent rolls, comparable sales and rents, operating statements, ownership of chattels, and utility costs. (Pls.' PFF 105.) Coile described the task as "reviewing for a value conclusion." (Tr. at 4928:20–4929:5.) Coile personally visited almost half of the Section 8 projects, including properties in Austin and San Antonio, as well as Robin Square in Dallas. He visited Steiner Ranch and one of the comparables listed in the appraisal of that property. Coile toured Steiner Ranch with Hughes and Ray Fletcher, FHLB–Dallas District Appraiser. During that site visit, Hughes pointed out the favorable terrain and views and Coile did not recall having any doubts or reservations about value. Coile thought Steiner Ranch had beautiful views and would be a nice development. (Tr. at 5121:23–5022:3 (Coile); Tr. at 1641:1–1643:1 (Hughes).)

During all investigations, Hughes cooperated fully with regulators, providing four-year operating histories for each of the apartments and arranging meetings with Hughes' personnel in charge of developing Steiner Ranch and Waterford Centre. (Pls.' PFF 116–18.) Thereafter, the FHLB–Dallas appraisal department advised Satterfield that the apartments seemed to be "okay," although Robin Square was the "bad boy of the group," and the appraisals submitted with the Application were reasonable estimates of value so long as the Section 8 contracts and Hughes' excellent management remained in place. (Pls.' PFF 111–31 (summarizing review and conclusions of regulatory appraisers).)

The Waterford Centre was undeveloped, but the FHLB–Dallas was aware that the submitted appraisals estimated its value as developed. (Pls.' PFF 136; PX 51 at 1980.) A review in September, 1987 concluded the appraisal was deficient. By mid-October, 1987 the submitted appraisal for Waterford Centre was found to be in "reasonable compliance with professional appraisal standards and FHLBB Memorandum R–41c." (PX 55 at 1; PX 58.) After inspecting expenses, competition, absorption periods and development costs, on December 16, 1987, FHLB–Dallas District Appraiser Lipscomb physically inspected the property and met with Gregson and Mr. Boss of Hughes' organization, obtained data from the City of Austin Building Permit section, and met with representatives of HCI hospital planning to build on the site. District Appraiser Lipscomb concluded that his "[p]hysical inspection, construction schedules, external research and interview with both hospital and Hughes people tend to support probable success of the project as proposed" and the "value" of Waterford "probably approaches the values estimated in the project appraisals after modifications were received." (PX 50 (onsite inspection report dated December 16, 1987 outlining construction schedule including county approval of roads within development, obtaining notice to proceed for water, wastewater, paving and drainage, with commencement of construction of medical office building within a year and the Beverly Heritage Hotel within a year and a half).)

Regulators also knew Steiner Ranch was undeveloped and its value depended upon further development. As disclosed, Tract B was going to be contributed in fee simple; and El Paso was "to participate as a joint venture partner in the profits from Tract A." (PX 255 at 2; PX 300 at 1747, 1751 (Hughes advises FHLBB that "Parcel A will be contributed through the conveyance of an 80% partnership interest owned by Applicant."); PX 326 at 1000.) Indeed the option agreement and the SRL partnership agreement was submitted to regulators in the Second Amendment to the acquisition application. (PX 289 at 6725, 6731–66.) On four days in December of 1987, District Appraiser Fletcher inspected Steiner Ranch and most of the

comparable sales except for one which was inspected by Chief Appraiser Coile "to confirm the reasonableness of the value estimates as promulgated by the W.F. Smith report (plaintiffs' appraiser) or to determine as possible a reasonable value range" which was concluded to be $12,322 per acre. (PX 66.) Coile kept supervisory officials Hovey and Satterfield informed of these matters. (Pls.' PFF 147.) Coile gave Satterfield an estimated equity figure, but neither Coile nor Satterfield could recall the number. Johnson, one of the three regulators most involved in the transaction, testified that the values reached by the appraisal staff were "typically somewhat less" but "usually" "not much less" than that which Mr. Hughes had proposed. (Pls.' PFF 148.)

After Coile and the FHLB–Dallas appraisal staff completed their evaluations of the 14 properties, Satterfield, head of the supervisory agents at FHLB–Dallas and head negotiator in the Hughes acquisition, took the lead at a December 30, 1987 meeting with Hovey, Coile, Hughes, Freedman and Gregson "to complete the negotiation of the transaction and [ ]complete the negotiation of the amount" of "equity investment by Mr. Hughes." (Tr. at 5999:11–20.)

Mr. Satterfield testified:

A: [T]he meeting to me was to complete the negotiation of the transaction and primarily to complete the negotiation of the amount that we would be—allow [sic] as an equity investment by Mr. Hughes for the properties, etc., that he's going to bring in.

Q: Now, this is the meeting, of course, where the $35 million number was set, right?

A: Yes.

Q: Okay, Was that a market value determination?

A: Here's the problem: You get into semantics.

In 1987–'88 when we were dealing with this, we never though about we would be sitting in a court of law arguing about a term. That was a term that was used, but the actual amount that was given was a negotiated amount that was given as an equity figure.

Q: Well, now, had you visited any of the 14 contributed properties?

A: No, I did not.

Q: Who were you relying on for information about the value of the properties?

A: Well, primarily I relied on our appraisers.

Q: And do you distinguish between a negotiated value and a market value determination?

A: Well, yes. You could—you get into semantics and might say a negotiated value and an estimated market value are similar because you're estimating. You really don't know what the market value is until you sell it, but there is a difference, but from a regulatory terminology, that's what we used.

(Tr. at 5999:16–25–6001:1–3 (Satterfield); Pls.' PFF 165–67.)

Mr. Satterfield was most concerned about the Section 8 properties because "low-income housing was not the type of property typically considered for infusion into an insolvent thrift." (Tr. at 6145:7–25 (Satterfield).) At the December 30, 1987 meeting, he asked Hughes to personally guarantee the apartments would generate $1 million per year net of debt service for ten years. Secondly, Satterfield also wanted Hughes to continue to manage the Section 8 properties because of the positive reports he had gotten about the competency and organizational skills of Hughes' management team, understanding that the cash flow from these apartments depended upon skilled management. (Pls.' PFF 159–60.) Thirdly, Satterfield required Hughes agree not to sell the properties for less than their book value without prior consent of the Supervisory Agent. These three conditions were raised and agreed to at the December 30, 1987 meeting. (Pls.' PFF 161–62.) After Hughes agreed to these three conditions,[22] Mr. Satterfield set the $35 million net equity value for the properties. (Pls.' PFF 163–66.)

Regulators wrote in contemporaneous memoranda that the equity value of the con-

---

**22.** Hughes' written agreement in this regard is     discussed above.

tributed properties totaled $35 million. (Pls.' PFF 169–73.) Hughes felt the properties had more than $35 million in equity, but agreed to less in order to make the deal. (Pls.' PFF 174.) Other documents refer to the $35 million as an "estimate"—an approximation of the aggregate equity value of the 14 parcels to be contributed. (Pls.' PFF 175.)

After the meeting, Coile allocated the $35 million in equity among the properties in a January 12, 1988 memorandum to Hovey. Ms. Hovey was an Assistant Vice–President with the FHLB–Dallas, and the regulator "most involved" in this transaction. In making the allocation, Coile did not consider Hughes' ten-year income guarantee on the Section 8 apartments. (PX 255.)

Coile's numbers were used by Hovey, Supervisory Agent, and Barclay, Principal Supervisory Agent, in their January 20, 1988 digest to the FHLBB (directed to Linda Plye, Director of Corporate Activities, OR-POS).[23] (PX 259.) Accordingly, Coile's supervisors and those advising the contract-makers—the FHLBB—referred to these allocations as "net estimated appraisal value (after debt) of $35,000,000." (PX 259 at 2.) "The appraisal department of the Federal Home Loan Bank of Dallas inspected all of the properties to be contributed and endorses[24] the values presented above." (PX 259 at 3.) This memorandum went through six reviewers. (PX 278.) The January 20, 1988 memorandum from Barclay, Principal Supervisory Agent to Plye, Director, Corporate Activities at ORPOS similarly referred to "net estimated appraisal value [after debt] of $35,000,000 ... being contributed by Mr. Hughes." (DX 464.) Indeed, even the FHLBB Approval characterizes the infused property as having "an aggregate net estimated appraisal value (after debt) of $35 million." (PX 338 at 3.)

To recap, the Application proposed contribution of equity of $47.3 million. After meetings and negotiations between appraisal representatives from plaintiffs and the government, the net aggregate value of the contributed real estate was reduced from $47.3 million to $35 million as memorialized in the First Amendment to the Application dated February 10, 1988. "Hughes shall ... cause partnerships and corporations controlled by Hughes to capitalize El Paso Holding with certain parcels of real estate ... [with] net appraisal value (after debt) of $35 million." (PX 354, Tab 2 (HS100166).)

The government claims the parties did not agree on the equity or value of the properties required to be contributed, citing *Corbin on Contracts* § 1113 (interim ed.2002).

> [W]hen the plaintiff is given the alternative remedy of restitution, the amount of his recovery is determined by the value of the performance that has been received by the defendant, and not by the value of that which was promised the defendant.... the price or rate fixed in the contract ... although admissible in evidence in an action for restitution, is not conclusive on the question of value as against either the plaintiff or the defendant.

(Def.'s Post–Trial Br. at 106–07.) That return of required contribution is constrained by the values set by the government at the time of the deal is neither unfair, unjust nor a windfall.[25] While the government was not purchasing the properties, it was agreeing on valuations for the purposes of determining regulatory capital compliance. Dr. Barry, one of the government's expert witnesses, testified that if the properties had that equity, New El Paso would have sold them to recover cash that could have been invested in income-earning assets, which in turn would have reduced the carry costs of these properties. On the other hand, it would have been

---

**23.** The proposal summary by FHLB–Dallas also describes the contributions as coming from Hughes ("... the following properties being contributed by Mr. Hughes ...") (PX 259 at 2.)

**24.** "Endorse" is "to give approval to; support; sanction (to 'endorse' a candidate)." *Webster's New World Dictionary* p. 449 (3d 1986).

**25.** Indeed, the court notes that in June of 1990, Hughes offered to settle all disputes with the government for return of the 12 Section 8 apartments and Waterford Centre. Over the government's objection, the court allowed evidence of this offer on the issue of unjust enrichment/windfall. Fed.R.Evid. 408. That offer did not factor into the court's analysis.

imprudent to sell the properties in a depressed real estate market.

Consistent with the foregoing, in his communications to regulators, Hughes and his representatives spoke of the proposed contribution, as negotiated, as $35 million. (PX 257 at 1; PX 272 at 4277, 4280, 4285; PX 289 at 5049, 6795; PX 313 at 2; PX 327 at 571.) The initial August 18, 1987 Application (PX 190) described the properties to be contributed and their values (later adjusted downward) net of debt. (PX 190 at 0922–23, 1092, 1627.) The January 15, 1988 Executive Summary (PX 257), the February 3, 1988 First Amendment (PX 272), the March 10, 1988 Second Amendment (PX 289), Freeman's April 1, 1988 Memorandum to Satterfield (PX 313), the April 22, 1988 subordinated Debt Application (PX 327) contained similar language. (Pls.' PFF 293–317.)

Furthermore, while in some *Winstar*-related acquisitions, real properties were allowed to be contributed and "booked" for regulatory purposes at higher than their market value, such a forbearance was considered unnecessary in this transaction because "the determination of the market value of the property [was] inherent to the transaction." (PX 798; Tr. at 5727:20–5733:10 (Hovey); Pls.' PFF 263–269.)

More than a year after the acquisition was approved, internal regulatory documents continued to describe the contributed properties as having equity of $35 million. (PX 574 (FHLBB examination report of El Paso Holding dated June 23, 1989); PX 616 (FHLB–Dallas Regulatory Plan for New El Paso described infusion of "approximately $35 million in appraised equity").) In Au-

gust 1989, a regulator wrote in an internal memorandum that "Mr. Hughes acquired the former El Paso Federal SA in May 1988, contributing (through El Paso Holding Corporation) approximately $35 million in real estate properties and $11.5 in qualifying subordinated debentures." (PX 602 at 2823.)

The court is guided by the Federal Circuit's instruction that "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1355 (Fed.Cir. 2001) (quoting *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969)). "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States*, 151 Ct.Cl. 262, 267, 283 F.2d 521, 524 (1960) (citation omitted). The court, therefore, embraces the principle that "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed.Cir.2003). Here, however, the damages involved lack imprecision. The amounts are fully supported by the record evidence.

In addition to the negotiated agreement, the valuation amounts found here are supported from the retrospective appraisal of the contributed properties by plaintiffs' expert appraiser, David Lewis.[26] Mr. Lewis

---

**26.** Lewis is an M.A.I. appraiser licensed in Texas, where he was born and raised in a family with four generations of appraisers. He worked as an appraiser in Texas since the early 1960s and, at the time of trial, lived 12 miles from Steiner Ranch. Other professional designations include that of Senior Residential Appraiser ("SRA") and Counselor of Real Estate for the American Society of Real Counselors ("CRE"). (PX 823.)

Lewis served as a member of the City of Houston Planning Commission from 1972 to 1975. From 1978 to 1980 he was the managing local consultant to the City of Houston in appraising over a million properties for *ad valorem* taxes. He was a founding member of the Board of

Directors of the Harris County Appraisal District which was responsible for the appraisal of all properties in Harris County.

In 1992, he was a consultant to and headed the negotiating team for the Metropolitan Transit Authority in the purchase of 158 miles of transportation corridors from the Southern Pacific Railroad. In 1993, he addressed the American Bar Association, Section of Natural Resources, Energy and Environmental Law, Litigation and Real Property, on "Environmental Considerations and the Elements of Value Affecting Real Property."

Lewis has acted as development, transactional, valuation and market damage consultant on various environmental issues and was qualified and

appraised all 14 of the properties as of May 27, 1988 and opined that the value of these parcels would not have varied substantially between December 31, 1987 (the day following the December 30, 1987 meeting between Hughes and regulators at which agreement was reached that the equity contribution would be $35 million) and May 27, 1988 (the date of the closing of this transaction and the date of Lewis' evaluation). Government witnesses, particularly Ronald Hendricks, the government's expert appraiser, and Dr. Barry did not offer opinions of fair market value of the equity contributed. An adverse inference from this omission is not necessary as there is ample affirmative evidence to support the court's findings in this regard. *See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.* 267 F.3d 1370, 1384 n. 7 (Fed.Cir.2001) (invoking missing witness rule).

The bottom line of the Lewis appraisals is that the aggregate value of the contributed properties was $94,200,000, which is within ten percent of the approximate $101 million in value reached by regulators—around $35 million in equity and $66 million in debt—reached at the December 30, 1987 meeting. (PX 822 (Waterford Centre appraisal); PX 823 (Steiner Ranch appraisal); PX 824 (appraisals of Section 8 projects); Pls.' PFF 318–48.)

The government called Mr. Ronald L. Hendricks, M.A.I., from Nevada City, California. He was not asked to appraise any of the 14 parcels: "I have no value opinions." (Tr. at 6988:12–6994:13 (Hendricks).) Despite expressly distancing himself and denying any opinion as to market value, Hendricks concluded that the opinions of value given by Lewis should be adjusted downward and, in some instances, given specific monetary adjustments. When questioned, Hendricks conceded his "adjustments" to Lewis' appraised values may have violated professional appraisal standards.[27] (Tr. at 6988:12–6994:13, 7005:4–18.) Moreover, considerable testimony was elicited at trial as to Hendricks' status as a licensed appraiser in California that did not reflect favorably on his credibility. (Pls.' PFF 355–359.)

Lewis' work was also criticized by government witness Professor Christopher Barry. (*See* Tr. at 7385–7501; DX 1527 at 20–35.) Professor Barry was not an appraiser; his criticism of Lewis' 9% capitalization rate in valuing the income-producing Section 8 apartments (particularly the Robin Square project which was subject to adverse news treatment in the *Dallas Morning News*[28]) and his other criticisms were adequately discounted and do not alter the court's findings herein.

**Contribution and purchase of subordinated debts**

In Amendment No. 2 (PX 289) dated March 10, 1988, the $11.5 million initially proposed to purchase preferred stock was amended to a purchase of subordinated debentures.[29] This Amendment noted that El Paso Federal had suffered an additional ten million dollars in losses from September 1987 to March of 1988, increasing the thrift's negative net worth to over $27 million.

Plaintiffs' request for money-back restitution includes this $11.5 million contribution.

---

testified as an expert witness in environmental lawsuits. *Forbes* magazine, December 31, 1990, quoted him concerning real estate damage due to the stigma of electromagnetic fields. He has lectured on real estate economics and valuation at the University of Houston, the American Institute of Real Estate Appraiser, and the Society of Real Estate Appraisers. (PX 823, Section V [curriculum vitae].)

27. Mr. Hendricks was questioned about USPAP (Uniform Standards of Professional Appraisal Practice) Advisory Opinion 20 ("Illustrations of the Language in an Appraisal Review Report with an Opinion of Value"). Generally, appraisers are precluded from giving opinions of value unless and until they have done certain investigations.

28. Regardless of the condition of the Robin Square apartments which were featured in the *Dallas Morning News,* this project, along with the other properties was appraised, examined, and observed by government regulators and values agreed-upon.

29. A subordinated debenture is a note or obligation of the thrift requiring payments over time. While the debt is secured, it is subordinated to most other creditors, hence its name. Qualifying subordinated debentures could be included in a thrift's regulatory net worth. *Winstar*, 518 U.S. at 846 n. 2, 116 S.Ct. 2432 (1996).

The government's objections are that Hughes really did not "contribute" $11.5 million and the details were not fully disclosed to regulators.

As amended, the Application proposed purchase of two classes of subordinated debt of the new thrift. Hughes personally contributed $1.5 million into the thrift and the thrift, in return, issued the Series B subordinated debenture. (PX 409.) Regulators approved the inclusion of this amount in regulatory capital. (PX 365.)

According to the May 1988 Bank Board internal OGC memoranda, "T.C. Steiner and Son, a Texas General Partnership and Steiner and Sons, Ltd. (the 'Steiner Partnerships') will purchase 100,000 shares of the Series A subordinated debt for an aggregate purchase price of $10,000,000 in cash." (PX 343 at 3). For tax reasons, Hughes was substituted as the purchaser. Simplified, but disclosed to regulators prior to the closing of the merger/acquisition, the total debt on the Steiner Ranch fee parcel was $21.5 million. The thrift only paid out $11.5 million. On May 27, 1988, Hughes executed a promissory note payable to Mr. Steiner for the remaining $10 million. The contribution Hughes "made" was to give Steiner a $10 million note in return for Steiner reducing his secured debt by that sum. As a result, in paying off the debt (and correspondingly increasing equity) the thrift paid out $10 million less. The cash flow to the thrift is the same as if Hughes paid $10 million cash to the thrift and the thrift paid $21 million to Steiner.

**The government's argument concerning net contribution**

■ The government argues that regardless of how the court resolves value, chain of title and materiality (discussed hereinafter), value must be reduced by benefits conferred on plaintiffs by regulators as part of the deal or by the subsequent operation of the thrift. Otherwise, plaintiffs would be placed in a better position than if the contract had not been breached.

New El Paso paid-off the debts on the contributed properties for which Hughes was personally liable. The government argues this debt payment should be deducted from any recovery as an offsetting benefit. The financial details in this regard were complex—but it is not necessary to determine whether Hughes was personally liable on these debts, or whether his liability was triggered, if at all, upon foreclosure of the security and pursuit of deficiency judgment. While payment of outstanding debt on the contributed properties may or may not have been a good business decision, it was the equity of these contributions (value minus debt) that was negotiated and contractually required.[30] Both the existence of the outstanding debt and the possible payment of those debts by the thrift after acquisition were disclosed. To the extent that debt was paid, the thrift's equity interest in the contributed properties increased. And when the real estate market in Texas recovered, the thrift would recover not only the newly increased equity, but also any subsequent appreciation.

The government argues plaintiffs not only benefitted from payment of the debts on the properties, but Hughes received interest payments on the subordinated debentures. However, these "benefits" did not come from government and were not required by the contract. Furthermore, they were not windfalls. There was no showing that the interest paid on the subordinated notes was in excess of what would be reasonable.

Only benefits received from the government are offset.

[G]enerally, any award of restitution to a plaintiff should be offset by the benefits he or she already has received from the defendant.... However... *Landmark* makes clear that offset is only proper where the benefits at issue were received

---

30. Amendment No. 2 to the Application included responses to questions raised by ORPOS and provided an opinion from the accounting firm Coopers & Lybrand concerning the tax treatment of subordinated debentures. That letter states that the real estate would be contributed to the new thrift, along with its mortgage debt. The thrift might pay off the mortgage debt with cash, some of which would be used to purchase the Series A subordinated debentures. In that event, the thrift would own the properties free and clear. (PX 289 at SF 6674–75.) The government does not contend that payment of the debts had to be approved.

**directly** from the breaching party. The [$1.2 million dividend plaintiffs received from the thrift] was not received **from** the government, nor pursuant to any **requirement** of the contract.

*Hansen Bancorp. Inc. v. United States,* 367 F.3d 1297, 1315–16 (Fed.Cir.2004) (citing *Restatement (Second) Contracts* 384 cmt. a).

Finally, the "benefits" cited by the government—even assuming the benefits as suggested—were not established as appropriate offsets to recovery. Consideration is bargained for and received from the other contracting party at the time of contract formation—not derived from subsequent favorable results inherent in that bargain. The thrift's business decision to pay off the debts on the contributed properties may have resulted in a "benefit" to Hughes or the Holding Company, but payment was neither bargained for nor required. Rather debt payment was a collateral consequence of the transaction. Accordingly, as *Hansen Bancorp* informs, to the extent Hughes and/or the Holding Company benefitted from the thrift's payment of debt on the property or from interest payments on the debentures, those benefits were neither received from the government nor paid as a requirement of the contract and are not benefits to be deducted from the return of agreed-upon value of contributions awarded here. *Hansen Bancorp,* 367 F.3d at 1316–17.

In a related defense, the government argues that Hughes would have lost these properties if the contract with the government had not been breached. As framed, this inquiry is related to the government's familiar "would have failed anyway" defense derived from *Admiral,* discussed hereinafter.

**The goodwill forbearance was a condition precedent and required contributions were made in reliance on that promise**

Contrary to many *Winstar* cases, this was an unassisted transaction, meaning the government did not provide cash or other consideration to plaintiffs to acquire the troubled thrift. Government witnesses testified at trial that the goodwill forbearance was the only

consideration given by the government. Mr. Satterfield, Director of Corporate Activities for ORPOS, with delegated authority [31] to approve the El Paso supervisory conversion, and the lead regulator who negotiated the transaction on behalf of the FHLB–Dallas, testified:

Q. And in connection with this acquisition, you recall that El Paso Holding asked for no cash contribution from FSLIC, right?

A. That's correct.

Q. And you understand that there was a forbearance request so that the value of intangible assets resulting from the accounting for the merger in accordance with the purchase method could be amortized by New El Paso, the resulting institution, over a period not to exceed 25 years?

A. That's correct.

Q. That's the goodwill forbearance?

A. Yes.

Q. And that forbearance is what allowed New El Paso, the resulting institution, to count the intangible asset of goodwill as capital for regulatory reporting purposes?

A. Well, it counted it as an asset, which basically did not affect the capital, yes.

Q. Well, and that forbearance that was granted by regulators allowed El Paso to amortize that goodwill over 25 years?

A. Yes, as an expense.

Q. You understood forbearances were granted by regulators only in cases where the forbearance was actually needed for the transaction to be consummated?

A. Yes.

Q. And, in fact, you recall that FSLIC had a policy to that effect:

A. I mean, that was a general policy that started in the early '80s. yes.

Q. You understood that if supervisory goodwill were not counted as regulatory capital that on the day that El Paso opened, the day after the transaction, it would have failed capital requirements?

**31.** ORPOS' delegated authority was shared with FHLB Office of the District Banks and Office of General Counsel, with the latter focused on legal aspects of the conversion. The former's role was minor.

A. Well, it would never have been allowed to open.

Q. And the forbearance allowing El Paso to count goodwill as regulatory capital, in fact, was necessary if the transaction was going to result in a thrift that met regulatory capital requirements?

A. That's correct.

Q. And other than the forbearance granted in connection with the application, you're not aware of any other obligation that the United States government was contractually required to perform in connection with the acquisition, isn't that correct:

A. Not in connection with the acquisition, no.

Q. And you're not aware of anything of value that was contractually required to be given to El Paso Holding or Mr. Hughes from the FSLIC other than the forbearance?

A. That's correct.

(Tr. at 6131:21–6133:25 (Satterfield).)

Janet Hovey, Supervisory Agent, also testified that this forbearance was the sole consideration:

Q. And the only thing of value that the FSLIC provided in this transaction or the Federal Home Loan Bank Board or the Federal Home Loan Bank of Dallas was the forbearance that it agreed to?

A. As far as the goodwill, yes.

Q. Yes.

A. Yes.

Q. . . . . when the goodwill was taken away in 1989 with FIRREA, it—FIRREA was taking away the only thing of value that the government had provided in the transaction?

A. That could be viewed that way, yes.

(Tr. at 5738:5–11 (Hovey).)

The government argues, however, that the goodwill forbearance was not the only consideration provided by regulators. Approval of the acquisition itself resulted in the conveyance of the troubled thrift's buildings, branches, employees, computers, equipment and furniture. Consideration, however, by definition must be positive. Plaintiffs' description is apt—"absent the goodwill forbearance, all plaintiffs received was a multi-million dollar debt that was not bargained-for and was not worth a peppercorn." (Pls.' Reply Br. at 6.) Alternatively, the conveyance of the thrift and its assets was inherent to the transaction—it was not consideration.

The government points to other forbearances granted as sources of consideration. For example, in forbearance No. 2, regulators agreed to exclude investments then in the thrift's portfolio in calculation of equity risk investments. (PX 366.) While the consequences of this forbearance is not before the court (and the parties do not detail the practicalities of this limitation), it is apparent that this forbearance, as well as the other forbearances, are or were of value **only if the thrift was open**. Regulatory capital was the "gateway." The elimination of that "gateway" eviscerated the other forbearances.[32] Remove the goodwill forbearance from the bundle of forbearances and there is no bundle at all.

The FHLBB Approval, Forbearance Letter and various internal memoranda reviewing the Application confirm that the government entered into a contract allowing New El Paso to count supervisory goodwill toward regulatory capital and amortize it over a 25 year period. On January 20, 1988, Barclay, the Principal Supervisory Agent, and Hovey, Supervisory Agent, informed ORPOS that "[t]he consummation of the acquisition is

---

32. Forbearance No. 1 addressed potential failure to meet regulatory net worth requirements of Section 561.13 due to "an increase in the contingency factor attributable to [New] El Paso." (PX 336 at 1.) Forbearance No. 2 permitted the thrift to "exclude all investments currently in [it]s portfolio in determining the amount available for equity risk investment." (*Id.*) Forbearance No. 3 allowed the thrift to reduce its liquidity require-

ment under certain circumstances. These forbearances were valuable only if the thrift was open and depended upon regulatory capital. *See Hansen Bancorp,* 367 F.3d at 1312 ("[T]o significantly narrow that gateway [to the enjoyment of the other contractual rights] violated material conditions in the contracts. The breach was 'substantial,' depriving the companies of the benefit of their bargain.") (citation omitted.).

based on the assumption that certain regulatory forbearances will be granted ... [including] [a]mortization of goodwill arising from purchase accounting, for regulatory purposes, by use of the straight-line method over a 25 year period." (PX 259 at 3–4.) Barclay and Hovey wrote that they had no supervisory objection to the requested forbearance. (*Id.* at 4.)

The right to treat supervisory goodwill as an intangible asset amortized over 25 years was a **condition precedent** to the acquisition of the troubled thrift. Supervisory goodwill was a material term of the agreement at the time of contracting. The question is whether that materiality remained a year later in the months leading up to and after FIRREA, its implementing regulations, and application to this thrift. As applied, materiality at the time of breach has become somewhat of a negative-causation burden placed on plaintiffs. The government's position is that materiality or totality of the breach means the plaintiffs must establish that the thrift would have survived (i.e., not be taken over) but for the elimination of regulatory capital and amortization. Plaintiffs counter that burden is not correct and, in any event, this thrift would have survived as best evidenced by regulators' pre-FIRREA assessments of New El Paso. Unlike *Admiral,* where it was clear that the thrift was failing, regulators' assessments of New El Paso (discussed in more detail hereinafter) were that the thrift had sufficient regulatory capital to survive until the economy improved and that any insolvency was some two years away.

The even-still evolving *Winstar* principles counsel that if it is clear that a thrift is headed towards failure before the effects of impending FIRREA legislation were felt,[33] then FIRREA's breach was not total. If FIRREA really had no relevant impact—i.e., the government promise was no longer material—then the breach was not material, substantial or total. On the other hand, if the importance of the government's contractual forbearance did not dissipate due to economic downturn and other conditions preventing the thrift from selling or developing its real estate assets during economic downturns, the forbearance remains material and substantial. Indeed, to the extent a regulatory capital cushion would buy time, that cushion could become more important as economic strictures tighten. The line on this continuum does not need to be drawn in thin air. The court concludes that it was not at all clear that this thrift would have failed pre-FIRREA. The court rejects the "would have failed anyway" defense regardless of whether the burden was on plaintiffs to prove the thrift would not have failed, or on the government to prove that it would. FIRREA was a substantial, material, and total breach. Money-back restitution/reliance is appropriate.

The government's promised treatment of supervisory goodwill was the *sine qua non* of these contracts. In assuming a material breach, the Federal Circuit stated: "it is clear that the Government's promise that was breached had substantial value.... [G]iven the choice between purchasing a failing thrift without the Government's promise regarding supervisory goodwill and purchasing one with it, a reasonable banker would surely take the latter." *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1381–82 (Fed.Cir.2001). In *Winstar,* the Supreme Court explained that supervisory goodwill was "essential" and "indispensable" in the acquisition of insolvent thrifts, and FIRREA was essentially an "act of repudiation." 518 U.S. at 839, 849, 850, 891–903 & n. 52, 116 S.Ct. 2432. The inquiry is whether the breach went to the heart or key precept of the contract and whether plaintiffs' claimed damages reflect the amount that plaintiffs contributed based on the crucial promise of goodwill treatment.

Contractually required contributions in *Winstar* cases are recoverable as either "money-back restitution," or, alternatively, as reliance damages. *Landmark,* 256 F.3d at 1372–73 (affirming trial court's award to plaintiff equal to value of plaintiff's initial contribution, noting that award could be

---

**33.** The court credits testimony that regulators and the banking industry felt the effects of FIR-

REA before its passage.

made under either reliance or restitution theory); *Glendale Fed. Bank v. United States,* 378 F.3d 1308, 1313 (Fed.Cir.2004), *cert. denied,* 544 U.S. 904, 125 S.Ct. 1590, 161 L.Ed.2d 277 (2005) ("[W]e have allowed restitution for the limited purpose of returning the acquiring thrift to the status quo ante when specific initial contributions to an acquired thrift have been established."); *La-Salle Talman Bank v. United States,* 317 F.3d 1363, 1376–77 (Fed.Cir.2003) (same result under reliance theory); *Far W. Fed. Bank v. OTS,* 119 F.3d 1358, 1365–66 (9th Cir.1994) (affirming restitution award equal to initial cash contribution); *RTC v. FSLIC,* 25 F.3d 1493, 1504–06 (10th Cir.1994).

Recently, the Federal Circuit reversed an award of $118 million for initial contributions in an assisted transaction under both restitution and reliance theories. In *Old Stone Corp. v. United States,* 450 F.3d 1360 (Fed. Cir.2006), these related concepts and their application in *Winstar* cases were summarized. Suffering a total breach, an aggrieved party " 'is entitled to restitution for any benefit that he has conferred' " on the breaching party " 'by way of part performance or reliance.' " 2006 WL 1420817, at * 8, citing *Mobil Oil v. U.S.,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (citing *Restatement (Second) of Contracts* § 373 (1979)) and *Landmark,* 256 F.3d at 1372. And, "restitution may be measured by either 'the value of the benefits received by the defendant due to the plaintiff's performance' or 'the cost of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract.' " *Old Stone* at 1371 n. 5 (citing *Hansen Bancorp,* 367 F.3d at 1314 (quoting *Landmark,* 256 F.3d at 1372)). "We have suggested that restitution of initial contributions of both stock and cash in *Winstar* transactions may be allowable because both forms of contribution confer a benefit on the government." *Id.* (citations omitted). The breach must be "total" in that the non-breaching party would have a claim for total as opposed to partial breach. *Id.* at 1371 (citing *Restatement (Second) of Contracts* § 373 cmt. a). The breach is deemed to be partial rather than total when the non-breaching party continues performance. After FIRREA, Old Stone did not terminate the assistance agreements and contracts and did not file suit for restitution. Instead Old Stone waited three years after FIRREA before asserting a right to restitution, and entered into a new Capital Plan with regulators concerning regulatory capital for the thrift. The government relied on Old Stone's "election" to continue its performance to its detriment by allowing the thrift to continue to operate, resulting in additional losses to the insurance fund. Accordingly, the Federal Circuit reversed restitution of initial contribution, holding Old Stone had a claim for damages but not restitution/return of benefits conferred or bestowed. New El Paso made no such election.

The Federal Circuit characterized the thrift's request for return of contributions under reliance, as a "loss caused by reliance on the contract." *Old Stone,* 450 F.3d at 1374–75, (citing *Restatement (Second) of Contracts* § 344(b)) such as pre-breach investments. *Id.* (citing *Westfed,* 407 F.3d at 1368, 1371 and *Glendale,* 239 F.3d at 1383). Reliance damages must be foreseeable and proximately caused by the breach. *Id.,* citing *Hughes Commc'ns Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir.2001). Both pre-requisites are met here. FIRREA caused (1) the seizure of the thrift and (2) the loss of the required contributions of real properties valued by the parties at $35 million and $11.5 million in cash equivalent to acquire subordinated debentures. It was certainly foreseeable that the $46.5 million, negotiated and required contractual contributions, would be lost if the government revoked its promise to allow the amortization of the negative net worth of the acquired thrift, which was a condition precedent to the acquisition and the gateway to the deal. *See Westfed,* 407 F.3d at 1365–66 (rejecting government's claim the thrift would have failed anyway, citing negotiations and regulatory admissions that without the forbearance, the acquired thrift would have immediately been out of regulatory compliance, and the Business Plan that contemplated several years until profitability, which assumed continuing regulatory capital forbearance).

" 'The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise.' " *Westfed*, 407 F.3d at 1368, citing *Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1382 (2001). The Federal Circuit in *Glendale* reversed an award of restitution of the failed thrift's net liabilities on the date of the merger, in favor of Glendale's reliance interest because, "[r]eliance damages will permit a more finely tuned calculation of the actual losses sustained by plaintiff as a result of the Government's breach." 239 F.3d at 1383. *Westfed* affirmed an award of reliance damages for actual costs and expenditures made in reliance on the agreement with the government. "Westfed is entitled to that amount it actually expended to acquire Old Western in reliance on the forbearance promise, which the government repudiated." *Id.* at 1368 (citing *DPJ Co. v. FDIC*, 30 F.3d 247, 250 (1st Cir.1994) ("[R]eliance damages aim to 'restore to the claimant what he or she spent before the opportunity was withdrawn.' ")).

▮▮ Restitution has been applied to return the non-breaching party to the *"status quo ante* instead of relying on the terms of the contract to obtain damages." *Admiral*, 378 F.3d at 1344. Restitution requires a "total breach" defined as one that "so substantially impair[s] the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Mobil Oil*, 530 U.S. at 608, 120 S.Ct. 2423 (quoting *Restatement (Second) Contracts* § 243 (1979)); *see also Hansen Bancorp*, 367 F.3d at 1311 ("[T]he critical part of this formulation is the statement that the breach 'substantially impairs the value of the contract to the injured party at the time of the breach.' "). "[T]he breach 'must be of a relatively high degree of importance.' " *Hansen*, 367 F.3d at 1312 (citation omitted). Drawing from the *Restatement*, the Federal Circuit

set forth five circumstances that are significant in determining whether a breach is total or material:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Hansen*, 367 F.3d at 1312. While discounting the importance of the third circumstance, the court stated that the first "will always be a pertinent consideration." *Id.*

In *Landmark*, the Federal Circuit affirmed the trial court's award of $21.5 million—for "real estate and cash valued at $21.5 million," contributions made as required under the contract with the government. 256 F.3d at 1370, 1373. *Landmark's* rationale and result apply with equal force here. " 'The Government must give the companies their money back.' " *Id.* at 1377 (citing *Mobil Oil*, 120 S.Ct., at 2438).[34]

It may not always be that "restitution" means "reliance," although the practical import can be the same. *Granite Mgmt. Corp.*, 416 F.3d at 1380. "[Theories of restitution and reliance] may be analyzed together because . . . a restitution claim 'based on recovery of the expenditures of the non-breaching party in performance of the contract' . . . 'can be viewed as a form of reliance damages.' " *Id.* (citing *Landmark*, 256 F.3d at 1373 ("In any event, the government's argument is irrelevant with respect to Landmark's initial

---

**34.** Awards have been for the value of required contributions. The government's suggestion that the value of the required contributions here be reduced by the phantom costs of liquidation to award only net realizable equity, is rejected.

contribution because the amount of the award would be identical under either standard.")). Accordingly, the court determines that the government's breach was total, substantial and material; the contributions here were required and made in reliance on the government's promise of regulatory forbearance.

**Materiality of breach**

█ Regulators and examiners did not regard New El Paso troubled before FIRREA. To the contrary, the thrift was recognized as having sufficient capital to survive until the Texas economy improved. In this regard, the court is mindful that the Business Plan filed with the Application focused on a three year plan which would give time for the economy to recover. Recalling that the acquisition was approved and the transactions subsequently closed in May of 1988, regulators' assessments of New El Paso after the acquisition and prior to FIRREA belie the government's vigorous dissection of the thrift and prediction of ultimate failure. Regulator's assessments also illustrate the materiality of the goodwill forbearance and thus the materiality of FIRREA's breach.

**December 1988 limited scope examination**

From December 13–28, 1988, FHLB–Dallas conducted a limited scope examination. (PX 469 at 0606 (regulators' memorandum as to scope of examination).) The examiner-in-charge was Javier Vasquez, who was identified by the government as a potential witness but was not called. (PX 488.) While limited in scope, examiners' assessments of targeted aspects of the thrift stand in stark contrast to their assessment less than a year later with the anticipation and enactment of FIRREA. Plaintiffs suggest an adverse inference from the government's failure to call this witness is warranted. See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1384 n. 7 (Fed.Cir.2001). New El Paso was given a MACRO rating of "2".[35] (PX 907; PX 616 at 1449 (listing then previ-

ous 12/31/88 examination rating); Tr. at 2090–91 (Hughes).)

First, analysis of "interest rate gap management" (the difference, or "spread" between interest earned or paid to the thrift on mortgages and interest paid out by the thrift to depositors and others), questioned whether rates on the thrift's adjustable rate mortgage portfolio were capped, but concluded "the risk controlled arbitrage activities of the Association" were "currently acceptable" and "the principal objectives of the institution [ ] have been achieved with minimal risk associated." (PX 488 at 1546, 0163–64.) While the need for appointment of a Chief Executive Officer ("CEO") was noted, as was a previously-voiced concern about the number of Hughes' family members on the Board of Directors, the examiners concluded that post-merger policies and procedures "provide management with sufficient guidelines to effectively supervise the affairs of the institution …" (PX 488 at 0163.) The Business Plan submitted with the Application was also reviewed (PX 469 at 0606); the examination report did not report adversely in this regard. (PX 488.) The thrift's MACRO rating in this limited examination was "2."

During this time [August 5, 1988], Hughes was nominated to serve on the Board of Directors of the FHLB–Dallas. (PX 431.)

**December 1988 to March 1989 internal regulators' memorandum**

Between December of 1988 and March of 1989, regulators prepared an internal memorandum concerning New El Paso stating that: "capital is currently reported at $45 million—equivalent to 10.9% of assets. We do not foresee any threat of deterioration or insolvency because of the current capital position." The prior MACRO rating from the limited scope examination was noted, as was a "full scope examination … scheduled to commence in April, 1989." The memorandum recommended the thrift's classification be changed from "distressed" to "marginal" and that the thrift be "monitored." Because it had $43 million of goodwill on the books

---

35. MACRO was a regulatory acronym used to identify areas of review of an assessment of a thrift's financial condition. Ratings ranges from a high of "1" to a low of "5." MACRO compo-

nents were: management, asset quality, capital adequacy, risk management and operations. (Tr. at 6166.)

(10.9% of assets), "[w]e do not foresee any threat of deterioration or insolvency because of the current capital position." (PX 907.) The thrift's problems were primarily attributed to large loans made during 1983 through 1986 before this acquisition. The memorandum was signed by Mickle, the Supervisory Agent responsible for New El Paso. (PX 907.) At trial, Mickle confirmed that there was no threat of deterioration or insolvency because of the thrift's capital position at that time. (Tr. at 5550:7–12; 5552:3–12 (Mickle).)

### March–May 1989 full-scope examination

Regulators conducted a full-scope, "top-to-bottom" review and examination of the thrift from March 13 to May 23, 1989. The Examiner–in–Charge, Joanne Cohen, was also identified as a witness by the government but was not called. The report was delivered to New El Paso on September 1, 1989—three weeks after FIRREA was passed. Regulators gave the thrift a composite MACRO rating of "3" defined in the FHLB Regulatory Handbook—Thrift Activities as follows:

> Institutions in this category exhibit a combination of weaknesses ranging from moderately severe to unsatisfactory. They are only nominally resistant to the onset of adverse business conditions and could easily deteriorate if concerted action is not effective in correcting the areas of weakness. Institutions which are in significant noncompliance with laws and regulations may also be accorded this rating. Their overall strength and financial capacity is such to make failure only a remote possibility. Such institutions are vulnerable and warrant special supervisory concern.

(PX 608 at 0264.) Operating losses of $1.4 million in the nine-month period ending March 31, 1989 were attributed primarily to the increasing cost of funds. While problems were noted, the report concluded "regulatory capital is sufficient to absorb additional losses until such time as the real estate market rebounds and non-performing assets are transformed into earning assets." (PX 608 at 0264.) So, 90 days before FIRREA was passed, regulators, having completed several months examination of the thrift, opined that although there were serious weaknesses, New El Paso's possibility for failure was "remote" and the thrift had sufficient regulatory capital to absorb additional losses until the economy improved and real estate values were restored at which time a healthy thrift would emerge.[36]

Prior to delivery of the September 1, 1989 report, regulators conducted an exit interview/presentation at New El Paso. (Tr. at 2094–21:2095:2 (Hughes).) Participants at the May 1989 meeting included Cohen, and Supervisory Agent Mickle as well as New El Paso's Board of Directors and senior staff. A transcript of the taped meeting was provided to regulators. At the meeting, Cohen complimented New El Paso's asset classification system as one of the best she had ever seen and regulators deemed asset quality "generally good." (PX 608 at 0274.)

Shortly after delivery of the September 1, 1989 report, Supervisory Agent Mickle circulated internally an assessment, a "regulatory plan" for New El Paso. (PX 616.) This plan was periodically prepared as a method for reporting to senior management in Dallas and Washington. (PX 616; Tr. at 5369:5–18 (Mickle) ("senior management" or "anybody in the Federal Home Loan Bank Board of Dallas [who] want[ed] to know the current status of El Paso, they would pull this document up on their computer.") (Tr. at 5523:5–18 (Mickle).) MACRO ratings for the March to May 1989 examination were "3's" with one "2." (PX 616 at 1449.) Insolvency was noted to be 24 months away. (*Id.*) This high-level assessment by regulators close in time to FIRREA was (1) any insolvency was two years away; and (2) New El Paso's business plan was "viable, assuming necessary regulatory approvals for the acquisition" of another thrift "is obtained.") (PX 616 at 1449, 1457; Tr. at 5517:1–18; 5521:20–5522:12 (Mickle).) As noted elsewhere, one of the several collateral consequences of New El Paso's regulatory capital deficiency was growth limitations. New El Paso needed to grow, but couldn't

---

**36.** During this time period, related programs were referred to as the "Phoenix Project." The phoenix was a mythical bird that, after being consumed in the fire of its funeral pyre, arose from the ashes with the freshness of youth. *LaSalle Talman Bank,* 317 F.3d at 1366 n. 2.

because its promised regulatory capital cushion was eliminated.

**Enactment of FIRREA**

FIRREA was enacted on August 9, 1989 and implementing regulations became effective on December 7, 1989. FIRREA undermined New El Paso's capital requirements and subjected it to consequences attendant that failure. Indeed, government counsel admitted that New El Paso was in capital compliance until FIRREA. (Pre–Tr. Conf., at 154:11–13 (Sacks).) Thereafter, New El Paso failed "due to FIRREA." (PX 672 (regulatory summary monitoring report dated December 1989) ("Did the institution fail its capital requirement for the first time during this month? [sic] Due to FIRREA? Yes").) On December 1, 1989, Dan Rabon for the District Director, OTS informed New El Paso it would be out of capital compliance on December 7, 1989 and had to submit a plan for rectifying that deficiency. "We recognize that the new requirements are substantially different than the old ones and that the effective date does not provide a great deal of time to assimilate these new requirements." (*Id.*) The thrift's failure to meet capital "requirements is largely the result of goodwill on El Paso Savings' books which equaled approximately $42,491M as of October 31, 1989." (PX 702 at 1235.) Ultimately, the thrift's MACRO rating plummeted to "5," defined therein as "[t]he volume and character of weaknesses are such as to require urgent aid from the shareholders or other sources. Such institutions require immediate corrective action and constant supervisory attention. Obviously, formal supervisory action is presumed necessary. The probability of insolvency is high for these institutions." (*Id.*)

New El Paso had more than $42 million of goodwill capital on December 6, 1989, (DX 700 at 0549 (line 788)), that did not count under FIRREA's new tangible capital requirements the following day. (PX 757 at 1.) The day before the effective date of the regulations, Hughes sued OTS and others in the United States District Court for the Western District of Texas to enjoin application of FIRREA's capital standards in lieu of the goodwill forbearance. Hughes did not declare a partial breach or elect to continue performance. (PX 647, 650); *see also Old Stone Corp.*, 450 F.3d at 1369–70.

To recap, materiality of the breach is determined at the time of the breach. FIRREA's breach was material as the foregoing contemporaneous regulatory examinations and statements support. While the government, including its expert witness Kennedy, presented many *post hoc* arguments and analyses, contemporaneous assessments by regulators are in stark contrast to those criticisms and the conclusion that the thrift would have failed anyway. Moreover, Kennedy's opinion was based on the assumption that the growth and other operational restrictions following FIRREA had no impact on New El Paso, an assumption that the court rejects. While the immediate impact of FIRREA was the elimination of goodwill, the secondary consequences of capital deficiency were severely restricting.

To be sure, the government has pointed out a myriad of other problems and criticisms of the thrift. True, New El Paso's first year performance was not as projected; true, the amount of supervisory goodwill increased from the approximately $19 million assumed in the original application—some $25 million more by the time of closing in May 1988, or a total of approximately $44 million. This $25 million increase reduced New El Paso's earnings by around $3.5 million per year—over $1 million annually as amortization ($25 million amortized over a 25–year period), plus an additional approximately $2.5 million annually from loss of anticipated earning assets ($25 million in assets which could have generated income at 10 percent or $2.5 million a year in "lost" income.). (Tr. at 602:4–604:1; 854:2–6; 855:1–856:13; 1974:13–22 (Gregson).) Also, New El Paso's actual losses exceeded those projected. The federal subsidy on Robin Square was lost; the project was abandoned, resulting in a one-time loss of $2.6 million. A rise in interest rates led to lower than anticipated sales of real estate owned. Real estate values fell even further. However, as recognized in the Business Plan, neither immediate profits nor a sudden turn-around were expected or planned. Time was necessary

for the economy to strengthen and real estate prices to return. Regulatory capital was the recognized cushion from which continued losses could be absorbed until the economy improved.

On July 2, 1990, the State of Texas appointed James Wright as Conservator.[37] (PX 763; Tr. at 2396:20–25 (Hughes).) The lead reason for the conservatorship was "insolvency on a tangible capital basis and . . . [failure to] meet the capital requirements of [FIRREA and a Texas Rule]." (PX 763 at 1.) After managing New El Paso for nearly two months, Wright, who had over 30 years of experience managing and regulating thrifts, believed it to be a viable thrift.[38] His assessment of the thrift was consistent with regulators' assessments pre-FIRREA. He wrote to the Commissioner of the Texas Savings and Loan Department on August 20, 1990. (PX 775.) His points included Accu-Bank Mortgage (a subsidiary of New El Paso) as the "key to profitability" and recommended approval of an application to expand AccuBank which would improve profitability "considerably." Wright complained that confidential information had been leaked a banking industry publication, then picked up by a local reporter that had the potential to damage New El Paso's franchise value. Noticeably absent from his assessment is any claim that the thrift "would have failed anyway." Indeed, his refutations of many of the defenses the government makes in this litigation, is accorded significant weight. And, an adverse inference is added given the government's failure to call him as a witness. Wright's words were strong and specific:

> Having reviewed the Capital Plan, I find it difficult to understand how liquidation or merger under the FDIC [Federal Deposit Insurance Corporation] method is less expensive than the Open Thrift Assistance request would be to the Insurance Fund. It appears that in almost every correspondence that we receive from OTS that there

is a considerable amount of comment relating to the competency of management. During the time I have been at the Association, I find that management in place at this time is very competent and is capable of managing the Association in accordance with the proposed Capital Plan. I particularly take exception to their statement that the adequacy of management being incompetent remains unchanged with the placement of a Conservator in the institution by the Texas Savings and Loan Department. I doubt very seriously if any of the regulators that are making these decisions has thirty years of experience managing and regulating Savings and Loans as evidenced by my background. Likewise, qualified individuals have been employed by the Association who are working very diligently to correct deficiencies and to resolve exposures to the FDIC. Without Capital assistance it would be very difficult to return [New] El Paso Savings to a profitable position, although a substantial amount of net worth could be recovered if the Association were to be able to return Goodwill to Capital and also if Mr. Al Hughes converted the Subordinated Debentures to Preferred Stock which he proposed to do in the Capital Plan filed with OTS.

(PX 775 at OTS–06 001893.)

Wright also wrote that $7 million in general reserves required by regulators was excessive. New appraisals had been requested to support a lower reserve. Appraisals for the 11 remaining contributed properties indicated a value of approximately $21 million (PX 799–808), some $6.5 million more than what regulators had allowed. (PX 742.) Wright countered many of the operational criticisms voiced by regulators and fully supported the thrift's lawsuit against OTS regarding the loss of the goodwill forbearance.

Even after FIRREA, Hughes was negotiating the infusion of additional capital into New El Paso, but as he testified, any com-

---

**37.** The July 2, 1990 Order of the Commissioner of the Texas Savings and Loan Association granted Wright the authority to "manage the affairs" of New El Paso and its subsidiaries, and "take charge of the[ir] books, records, property, assets, liabilities, and business." (PX 763 at 3.)

**38.** Although included in the government's witness list, Wright was not called as a witness.

mitment was contingent on regulators honoring the contract to allow regulatory goodwill. (Pls.' PFF 906.)

The court finds that the actions of the parties before the onset of this controversy are most probative on the effect of FIRREA. The court does not find that New El Paso was without economic risk, nor that absent FIRREA New El Paso clearly would have survived, or would have survived for any set period of time. It is found, based on all the evidence and testimony of witnesses, that FIRREA was a substantial, material, and total breach. The only consideration (or, even under the government's position at least a major component of consideration) for the contract was eliminated, comprising a material, substantial and total breach. If plaintiffs were seeking lost profits, future viability in this regard would be a valid concern. Here, however, plaintiffs seek a return of required contributions in circumstances where the thrift was not failing pre-FIRREA.

Immediately after passage of FIRREA, federal regulators began to take adverse action against New El Paso. In contrast to the somewhat critical regulatory reviews, reports, and treatment of New El Paso prior to FIRREA, with insolvency some two years away and sufficient regulatory capital to absorb losses everybody knew were going to continue until such time as the economy improved, on August 18, 1989, a week after FIRREA was passed, Supervisory Agent Mickle informed the FHLB–Dallas Regulatory Review Committee that "we will be asking the Board to sign a Supervisory Agreement." (PX 945 at 0553.) A Supervisory Agreement is the least intrusive form of administrative enforcement. (Tr. at 5509:14–5510:7 (Mickle).) Yet, three months later, November 15, 1989, Mickle recommended a Cease–and–Desist Order, although he did not testify to any intervening changes in New El Paso's condition. Regulators' attitudes changed. Tellingly, Mickle testified that the grounds he cited for a Cease and Desist Order were the same as he cited three months earlier. He "dressed-up" and enhanced these issues and

failed to disclose that matters had been remedied.[39]  (Tr. at 5539:5–25 (Mickle).)

Mickle's October 16, 1989 change of New El Paso's classification from "marginal" to "distressed," cites only insufficient capital as a reason. (PX 637 ("It appears very possible that the expected capital contributions may not be forthcoming, therefore, we are reclassifying this institution as distressed. Because the owner has indicated he has the ability to make the additional investment and has indicated he will do so to protect his existing investment, we have not classified this institution as 'resolution' as per our discussion.").) One month later, on November 17, 1989, Mickle recommended further downgrading to "Resolution 2" because of internal regulatory classification changes, again solely because of capital reasons. (PX 651. ("The most recent revision to the Regulatory Monitoring System classified [New El Paso] as 'distressed'. This is to recommend reclassifying this institution to 'Resolution 2.' The institution is insolvent on a tangible capital basis and currently has poor prospects for meeting a 3% tangible capital requirement.").) Mickle's testimony reaffirmed that this downgrading was due solely to loss of capital, which was due to FIRREA. (Tr. at 5531:10–25 (Mickle).)

Besides eliminating goodwill, FIRREA also restricted New El Paso's ability to grow and imposed burdensome regulatory oversight because of the thrift's deflated capital status. Plaintiffs presented considerable evidence that regulators' failure to approve (indeed even to react or respond to) pending requests to sell assets, or to invest in what could have been profitable ventures, sealed New El Paso's fate. The thrift could not show it was not going to fail because regulators would not respond to the thrift's attempts to do just that.

On December 1, 1989, regulators informed New El Paso that it would fail capital requirements on December 7, 1989, and was therefore subject to growth and operational constraints contained in Regulatory Bulletin 3a (RB–3a). (PX 660 (letter from Dan Ra-

---

**39.** Subjecting New El Paso to stricter loan and other operational scrutiny enhanced the contractual breach. *Fox Valley Eng'g, Inc. v. United States,* 151 Ct.Cl. 228, 240–41 (1960).

bon, for the District Director of OTS).) New El Paso could not:

(1) Grow beyond net interest credited as of December 6, 1989;

(2) Make any capital distributions;

(3) Renew, rollover, or increase brokered funds without the approval of the FDIC;

(4) Add any individual to the Board of Directors or employ any individual as a senior executive officer of the institution or holding company;

(5) Make any equity investments; or

(6) Act inconsistently with any other limitations on activities established by statute, regulation or by the OTS (including compliance with any existing supervisory orders or agreements).

(PX 660 at 0976.)

The consequential limitations from regulatory capital deficiencies prevented New El Paso from expanding. And growth was always understood as necessary for the deal to work. (PX 650.) As Mr. Hughes testified, "[W]e had always known that we needed to grow, that we had to cover the goodwill that [New El Paso] took." (Tr. at 2247 (Hughes).)

Q. By not growing ... if you cannot grow beyond the net interest credited, can you make loans, new loans?

A. No, sir, you cannot.

Q. Okay, Can you take additional deposits?

A. No, sir.

Q. And if you cannot make new loans, is there any way using traditional thrift operations that you can continue to make money?

A. No, sir, you cannot.

Q. What was the impact of the letter from Mr. Dan Rabon [PX 660] on the operations of [New] El Paso?

A. They were dramatic. We were—pretty well closed the institution as far as being able to continue on as a—in the plan that we had and move forward to profitability.

(Tr. at 2247:25–2248:1–15; Tr. at 5521 (Mickle) ("Q. . . Now, [New] El Paso had told you repeatedly that it wanted to grow because of the problem of the drag of its goodwill, hadn't it, sir?   A. [T]hat's correct.").)

After FIRREA, regulators failed to respond to or rejected several of New El Paso's requests for approval, including its (1) Capital Plan, (2) application to purchase mortgage servicing, (3) request to sell the 11 Section 8 apartment projects, (4) request to sell Elmwood Fitness Center, and (5) request to make construction loans at Steiner Ranch. (Pls.' PFF 916–971.)

In compliance with regulators' demands, New El Paso submitted a proposed Capital Plan on January 9, 1990 (DX 718), projecting compliance with new capital requirements by the end of 1990 by converting the $11.5 million in subordinated debentures into permanent capital and by expanding the servicing portfolio of its mortgage company subsidiary, AccuBank, to nearly $6 billion with minimal increase in costs. (Tr. at 2284:10–24 (Hughes).)

A review, completed two days later, concluded there were four areas where the Capital Plan was incomplete. (DX 723; Tr. at 6227:6–21; 6228:20–6229:4 (Casteel).) Usually, regulators would ask the thrift for any missing information. Here, despite New El Paso's "difficult financial straits" and "time was of the essence," regulators did not contact the thrift. (Tr. at 6330:6–15 (Casteel).) An unsigned draft requesting additional information from New El Paso was attached to an internal regulatory memorandum recommending rejection of the Capital Plan and requesting review by OGC counsel. "OGC counsel has no problem with our **intended** denial [of New El Paso's proposed Capital Plan] but has asked to review our correspondence **prior to its being sent to the institution**." (PX 963 (emphasis added).)

Regulators' lack of response was noted at New El Paso's March 28, 1990 Board meeting. "[W]e need to increase our mortgage lending portfolio. However, without getting our Business Plan approved, it is extremely hard to do that. . . . [W]e are pretty well locked out of the lending market until they decide on our plan. Their decision was due February 27 and to date they cannot estimate when we may expect a decision." (PX

715.) New El Paso wrote to regulators three times—on April 4, May 11, and June 8, 1990—complaining that it had not received a response to its Capital Plan. (PX 717 (April 4, 1990 letter from New El Paso responding to a March 27, 1990 letter from OTS denying a brokered deposit waiver "based upon serious deficiencies in your institution's capital plan . . ." by asking "We have not received a reply from OTS or FDIC to our business plan and feel it somewhat onerous to reject our brokered deposit request based on business plan deficiencies without disclosing the deficiencies."); PX 949 at 0173–74 (May 11, 1990 letter to regulators enclosing "list of items waiting for (OTS) approval/response," the first of which was the Capital Plan); PX 979 (June 8, 1990 letter to OTS referring to "inaction" on Capital Plan).)

Regulators decided to wait to communicate with New El Paso until after completion of an examination in March of 1990.[40] (PX 975; *see also* PX 959 (March 29, 1990 internal regulatory memorandum noting denial letter was going through internal review).)

New El Paso's January 1990 Capital Plan was returned to the thrift on June 6, 1990, because regulators considered the plan "withdrawn" based on Hughes' statements at a May 31, 1990 Board of Directors meeting. (DX 1418.) Hughes denies making such a statement, the minutes of that Board meeting do not reflect such, and. Hughes' subsequent communications deny it. (DX 774; PX 756; PX 979.)

On May 23, 1990, regulators ordered "write-downs" of the contributed apartments and Waterford Centre by $25 million. This paper reduction of capital would have most certainly negatively affected the Capital Plan. (Tr. at 6328:1–14 (Casteel).) A new Capital Plan based on Open Thrift Assistance was submitted because inaction on the January 1990 plan rendered much of it obsolete.

Shortly after FIRREA was enacted, Hughes acquired Shawmut First Mortgage ("Shawmut"), a mortgage servicing [41] subsidiary of Shawmut Bank in Dallas. Hughes testified he felt Shawmut was an opportunity to increase New El Paso's earnings and presented growth opportunities, particularly because the increasing number of thrift failures presented an emerging market for mortgage loan servicing. For various reasons, including a cumbersome and lengthy application process, Shawmut was acquired by a New El Paso subsidiary, renamed BancNet and later AccuBanc. Initially, Shawmut had over $1 billion in servicing and subsequently acquired $2 billion more. Shawmut had originated new loans at the rate of $1 billion per year. This was (and would have been) a profitable business. Mr. Kennedy, the government's expert, testified there would have been substantial benefits to New El Paso if it had been permitted to purchase additional mortgage servicing. However, permission to expand in this area was not granted.

New El Paso arranged for a warehouse line of credit with Bank One to have additional lending capacity and purchase an additional $3 billion in loan servicing. However, New El Paso's request to acquire the additional servicing and the line of credit was denied. (Pls.' PFF 939–40.) New El Paso projected over $20 million in profits with the increased servicing portfolio. Regulators *admitted to* $5.2 million in profits in 1990 alone. (DX 781 at 0074; Tr. at 3787:1–25, 3728:18–3729:12 (Hughes); PX 770 at 0106 (state regulators stated in May 1990 that "AccuBanc was a profitable move").) Losses from a June 30, 1990 consolidated financial statement resulted from accelerated depreciation and a one-time write-down and balance sheet restructure used by Shawmut to reduce profitability.

---

**40.** Regulators consulted with counsel about this delay; counsel gave a "verbal concurrence." (PX 975.)

**41.** Mortgage servicing is accepting loan payments from borrowers and forwarding to the lienholders, less a small percentage. In addition to these periodic fees, new loans generated origination fees. Also Shawmut had a $30 million pool of non-interest bearing tax and insurance

escrow accounts—essentially free deposits. New El Paso could earn sufficient income from these escrow accounts alone to pay for the cost of acquiring Shawmut. Mortgage servicing counted as capital under FIRREA. (Pls.' PFF 936–37.) During a December 1989 examination, OTS recognized *the net positive benefit of the acquisition* of Shawmut. (DX 704 at 0017; Tr. at 3726:6–12 [Hughes].)

(DX 788 at 1590; Tr. at 2758:19–23, 2759:15–21, 3728:18–21 (Hughes).)

Shawmut (without the expanded loan servicing portfolio) was sold by the Resolution Trust Corporation ("RTC") for $75 million. RTC asked Mr. Hughes permission to use New El Paso's operating losses as offset to that gain, and Mr. Hughes agreed. (Pls.' PFF 942–43.)

New El Paso sought required approval for the sale of 11 of the Section 8 projects for approximately $25 million dollars, with offers ranging from $1 to $2 million dollars down and promissory notes with interest at 8.5% to 8.8%. (PX 639 at 0970.) That the original estimated appraised value of the original 12 projects (Robin Square now excluded) was approximately $26 million, (PX 464; Pls.' PFF 944–60), is further support that this thrift could have survived absent the government's breach.

In early 1990, New El Paso was precluded from selling the Elmwood Fitness Center (for $5.4 million with $1 million cash down). March 9, 1990 Board minutes reflect "the proposed sale of Elmwood has been awaiting OTS approval." (DX 744 at 2144.) As was the case in denying sale of the Section 8 apartments, regulators denied the financing as counter to FIRREA's loan-to-one-borrower limitation ("LTOB"). Consequently, "[New El Paso] cannot make two loans on the leasehold improvements of Elmwood Fitness Center in the combined total of $5,400,000 without violation of the institution's LTOB limit." (PX 724 at 1; Pls.' PFF 961.)

New El Paso's ability to grow was so severely limited that it could not even make share loans—loans secured by existing deposits—without prior regulatory approval. Mr. Mickle was incredulous that New El Paso was prohibited from making share loans after FIRREA. (Tr. at 5547:5–6; 17–19 (Mickle).)

On May 18, 1990, Hughes forwarded a legal opinion he had obtained that regulators' decision "to preclude [New El Paso] from the sale of contributed assets is not in keeping with proper application of the loans-to-one-borrower limitations." (PX 740.)

New El Paso was precluded from construction financing and home mortgages at Steiner Ranch even though during the prior 18 months there had been no incidents of default. A January 22, 1990 request for permission was rejected by regulators on February 1, 1990. Thereafter, New El Paso made several additional requests, to which no response from regulators was ever received. (Pls.' PFF 964–65.) Plans to acquire other thrifts, which Hughes projected would lower cost of funds and reduce net operating losses, were thwarted by regulators as well. (Pls.' PFF 967–971.)

Plaintiffs suggest that the timing of the write-downs of the contributed properties, operational restrictions and failure to respond to requests for required approvals was posturing for just the argument the government makes here—that FIRREA was not material; the thrift would have failed anyway. (Pls.' PFF 927–28.) Such unilateral actions by the breaching party do not detract from the materiality of the breach.

The government relied heavily on the March 1990 post-FIRREA examination to assert FIRREA was not a material, substantial or total breach because New El Paso was going to fail anyway. (DX 781.) In category after category, regulators' conclusions were in stark contrast to pre-FIRREA assessments. Rutschman, the Examiner-in-Charge of the 1990, post-FIRREA examination, admitted that their examination was a "harder" look. (Tr. at 8430:11–23; DX 1380 at 0035 (draft of internal regulatory memorandum that "the current regulatory and legislative requirements" are "not the same old game anymore, so step up to the line and play by today's rules").) The examination, however, found that New El Paso's inadequate capital was a significant, if not the most significant problem it was facing—commenting its "capital base was inadequate," it was "technically insolvent," and "failed to comply with the tangible, core, and risk-based capital standards established by FIRREA." (DX 781 at 0069.)

New El Paso digressed from a thrift with some admitted weaknesses (but with sufficient capital to weather economic recovery, with any insolvency some two years hence),

to distressed, to Resolution 2 within three months after FIRREA. FIRREA was a material, substantial and total breach in that it "so substantially impair[ed] the value of the contract to the injured part[ies] at the time of the breach that it is just in the circumstances to allow [them] to recover damages based on all [their] remaining rights to performance." *Admiral Fin. Corp.*, 378 F.3d at 1344–45 (citations omitted).

Plaintiffs are not seeking lost profits. Plaintiffs are simply asking for their money back because FIRREA was a total, material, and substantial breach. Return to profitability is not a hurdle plaintiffs must leap. The so-called "would have failed anyway," is a hurdle the government rightly raises in determining whether FIRREA was a total, material, and substantial breach or merely " 'sheer happenstance.' " *Admiral*, 378 F.3d at 1345 (citing *Admiral Fin. Corp. v. United States*, 57 Fed.Cl. at 432). "In the event of such a breach, the non-breaching party is entitled to restitution whether the contract 'would, or would not, ultimately have proved financially beneficial' to the non-breaching party." *Id.* (citing *Mobil Oil*, 530 U.S. at 608, 120 S.Ct. 2423). The government did not meet its burden in this regard.

**Tax gross-up**

Plaintiffs claim an additional amount to compensate for taxes that might be paid on the award. A tax gross-up would not only be speculative, the government counters, but would be unfair because plaintiffs belatedly asserted this claim and the government did not have the opportunity for full discovery. Also, a tax gross-up to cover taxes that may or may not be assessed could be an unfair windfall.

Over the government's motion in limine, the court allowed the written proffer of Bruce G. Barre, presented in unilateral question and answer format. (DX 1700.) Mr. Barre, an accountant for Hughes and his wife, Patricia, family and affiliated entities since 1985, prepared or supervised the tax returns for Hughes and his affiliates since

1987. He concluded that total federal and state income tax on an award of $46,500,000 would be no less than $2,905,172. (DX 1700 at 2.) On that basis, plaintiffs add that amount to their claim for relief.

Barre's opinion assumed a $35 million award to the Holding Company and a $11.5 million award to Hughes personally. He excluded a contingent fee payable to counsel as well as amounts due to the FDIC and the descendants of Thomas C. Steiner, Jr., deceased.

Barre's proffer acknowledged that a decision by the Supreme Court in *Commissioner v. Banks*, then pending before the United States Supreme Court, to include contingent fees in gross income, would result in "substantial additional taxes." (DX 1700 at 4.) Subsequently, resolving a circuit split, *Commissioner v. Banks*, 543 U.S. 426, 429, 125 S.Ct. 826, 160 L.Ed.2d 859 (2005) held that "as a general rule, when a litigant's recovery constitutes income, the litigants' income includes the portion of the recovery paid to the attorney as a contingent fee." Accordingly, Barre's contingent fee deduction was no longer appropriate.

Barre then submitted an Amended Proffer that the amount of minimum tax would not change because the contingent fees would be capitalized and added to plaintiffs' tax basis. The gross restitution award would be reduced by the tax basis (including the contingent fees) in calculating taxable gain—the same result as in his original proffer.

■ Noting expert testimony in this regard in the case then before it, the Federal Circuit "adopt[ed] the rule of other courts that a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable." *Home Sav. of Am. v. United States*, 399 F.3d 1341, 1356 (Fed.Cir.2005).[42] Plaintiffs' burden is two-prong—to establish that the money (or here the equity in the real properties and cash for purchase of subordinated debentures) would not have been taxed,[43] and the damage award here would be taxed. *Id.*

---

42. There was discovery in *Home Savings*, which, unlike this case, was a "Guarini" case concerning certain tax treatment promised by the gov-

ernment. Accordingly, expert reports presumably vented these issues.

43. Query whether the determination that no tax would have been paid was the event of contribu-

The government questions whether any award would be taxed because it represents replacement of a lost capital asset.[44] The court is sympathetic to the government's lack of discovery to explore what the tax treatment would have applied had these properties not been contributed in reliance on the government's promise. Complaints of lack of discovery aside, the government also pointed out that Hughes' tax liabilities have been sporadic, suggesting that taxes may not be as definitive as Barre opines.

In 1985, Hughes paid about $5,000 in taxes; in 1986, he projected a $115,000 refund; in 1987, he paid no federal income tax; in 1988, he paid $4,000 in taxes and in 1989, none. (PX 180 at SF1117; DX 3005–07.) Also, that the properties were held in various Hughes-related entities prior to their contribution involves transactions and tax treatment, the intricacies of which are not before the court. The taxability of this award, in whole or in part, and whether the award represents monies that would not have been taxable at either the time of contribution or at the time of breach, have not been determined on this record.

◼◼◼◼ Trial courts "generally do not gross-up damage awards to take into account the plaintiff's tax liability on the award unless a plaintiff can show with reasonable certainty that the gross-up is necessary to make plaintiff whole, the award will be subject to taxation and, for purposes of calculating the gross-up, that the award will be taxed at a certain rate." *Citizens Fed. Bank v. United States*, 59 Fed.Cl. 507, 521 (2004). The *Citizens Federal* court rejected a claim for gross-up as "too speculative to be awarded because the Court [did] not know that the award will be taxed nor the rate at which it would be

taxed." *Id.* at 523. The same reasoning applies here.

Plaintiffs want to preserve their option to seek relief from possible tax consequences via RCFC 60(b). The government questions the use of Rule 60(b) as an appropriate vehicle for reopening a final judgment to consider a tax gross-up. The government asserts this would be a collateral issue, not an alteration of the judgment and points out that a Rule 60(b) motion does not require the court's leave.

Adopting the reasoning of *Bank of America v. United States*, 70 Fed.Cl. 246 (2006) on the availability of RCFC 60(b) for ventilation of tax gross-up in *Winstar* cases, to the extent the award to Hughes is ultimately found to be taxable, but would not have been if there had been no breach (or no contribution or whatever the test for comparison may be), Hughes has the option to apply for Rule 60(b) relief.

### Risk-shifting

◼◼◼◼ Following initial post-trial briefing, the government filed a Renewed Motion for Summary Judgment, contending that this court's prior holding in *Hughes I* was subsequently effectively overruled by *Admiral Financial Corp. v. United States*, 378 F.3d 1336 (Fed.Cir.2004) ("*Admiral III*") a decision rendered after conclusion of trial and post-trial submissions in this case. The government asserts that a provision in the RCMDA signed by the Holding Company and FSLIC more than two weeks after the Application was approved, contains the so-called "successor regulation clause"—a concession that regulations could change which, in turn, could increase the Holding Company's obligation in the RCMDA to shore-up the thrift's capital to new, and potentially higher, standards.[45]

> [C]ause the Regulatory Capital of the Resulting Institution to be maintained at a level at or above the Regulatory Capital Requirement, and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement and cure a Regulatory Capital Deficiency during the first quarter after which the Resulting Institution fails to meet its Regulatory Capital Requirement.

(Def.'s Renewed Mot. for Summ. J.App. 2.) Regulatory Capital was "defined in accordance with

---

tion, the time of the breach, the time of the takeover, the time of liquidation, or some other time.

**44.** This position may not be consistent with the government's position that the value of Hughes' contributions of real properties should be reduced by taxes and other costs of sale, and only the net realizable value be awarded as restitution/reliance damages.

**45.** In the RCMDA, the Holding Company agreed to maintain New El Paso's regulatory capital by infusing additional capital if necessary, to:

All references to the regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's [46] obligation under this Agreement. (Def.'s Renewed Mot. for Summ. J.App. 2 [emphasis added].)

The court ordered supplemental briefs on the successor regulation clause. Plaintiffs assert *Admiral III* is distinguishable because the government "plainly" gave consideration in addition to the goodwill forbearance. Here, the regulatory goodwill forbearance was the only consideration given by regulators and if that could be taken away unilaterally, the acquisition agreement would be illusory.

Subsequently, the Federal Circuit in *Franklin Federal Savings Bank v. United States*, 431 F.3d 1360, 1370 (2005), held that there the government's approval of the transaction itself and alone was sufficient consideration to support the over-arching contract. To avoid the consequences of *Franklin Federal*, plaintiffs argue (1) the plaintiffs in *Franklin Federal* admitted (and touted) that the approval of the transaction was consideration and (2) the government waived this affirmative defense of assumption of risk by not properly raising it.

■ Under binding Federal Circuit precedent, the court concludes the Holding Company agreed to bear the risk that regulatory capital requirements could change both in amount and in constituent components, and that the issue is properly before the court, again. However, inquiry does not end there. Hughes did not sign the RCMDA agreement; the RCMDA did not incorporate any of the other contractual documents; the Forbearance Letter is unconditional in its grant of amortization of goodwill for up to 25 years; and the amortization of goodwill forbearance was a condition precedent to the seminal offer here, the Acquisition Agreement.

12 C.F.R. § 561.13(b) or any successor regulation thereto." (*Id.*)

[46]. The Holding Company was the "Acquiror" in the RCMDA.

Successor regulation language is not always the end of the road. Consistent with the fact-intensive Federal Circuit holdings in *Winstar* cases, *Hometown Financial Inc. v. United States*, 409 F.3d 1360, 1365 (Fed.Cir. 2005), affirmed that the "correspondence, memoranda, forbearance letters, and regulatory maintenance and dividend agreements gave rise to a contract which included provisions addressing goodwill." The FHLBB Resolution approving the transaction defined regulatory capital as whatever the regulation provided at a given time, except that for the first five years, regulatory capital "shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988." *Id.* at 1366. Parsing the clauses, the Federal Circuit noted that regulatory capital requirement, defined as that "at a given time computed in accordance with 12 C.F.R. § 561.13(b), or any successor regulation thereto, ... place[d] the risk of regulatory change on Hometown (the acquirer)." *Id.* at 1368 (parenthetical added). "However, that risk was superceded for the first five years by virtue of language immediately thereafter, ... **except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988."** *Id.* at 1367 (emphasis in original). The "except that" language trumped the general assumption of risk. Any other interpretation would read the "except that" qualifier as either "servient" or "out of the agreement altogether." *Id.* at 1368. The Federal Circuit distinguished *Admiral* and *Guaranty* as having different "topography," although *Guaranty* presented a closer question.[47]

47. In *Guaranty*, a footnote to the definition of Regulatory Capital Requirement "incorporated" the forbearance letter. *Guaranty Fin. Serv., Inc. v. Ryan*, 928 F.2d 994, 999 (11th Cir.1991).

Subsequently, in *Franklin Federal*, FHLBB's approval of the acquisition was conditioned upon Franklin Federal, the holding company, signing a Dividend Agreement. 431 F.3d at 1362 n. 1. The Dividend Agreement prohibited the holding company from receiving dividends if the thrift's regulatory capital fell below a certain level, and subjected the thrift to immediate seizure if its regulatory capital fell below that level for more than 30 days. *Id.* at 1363. In negotiations, it was clear that the deal would not have been approved without the Dividend Agreement which recited that the Holding Company's commitment was " 'in consideration of the FSLIC acting favorably on the Application for approval of the transaction.' " *Id.* (citation omitted). The Dividend Agreement included successor regulation language: "all references to regulations ... shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's [the holding company's] obligation under **this Agreement.**" *Id.* (emphasis added).

The Federal Circuit also concluded the integration clause of the Dividend Agreement did not incorporate the approval and forbearance letters because they were not agreements "but merely regulatory approvals that could only become enforceable by the mechanism of the Dividend Agreement." 431 F.3d at 1366. Because of difference in terminology ("regulations" versus "regulatory requirements"), *Franklin Federal* declined to find a conflict between the Dividend Agreement's successor regulation clause and the provision in the forbearance letter that it "shall not be construed to constitute forbearance ... with respect to any regulatory or other requirements other than those [specified in the forbearance letter]." *Id.* at 1360. Because the thrift had no cause of action, "we need not reach the issue of shareholder standing to enforce the alleged promise." *Id.* at 1371.

The Holding Company's RCMDA here has no integration clause. FHLBB's approval of the El Paso acquisition was not conditioned upon the execution of the RCMDA.[48] Also, in *Franklin Federal* approval of the acquisition was sufficient consideration to support the holding company's dividend limitation and assumption of the risk of regulatory change. In the instant case, FHLBB's approval was on May 13, 1988; therefore the recital of consideration in the May 27, 1988 RCMDA (by FSLIC not the FHLBB) may be more rhetorical than real. The closing on May 27th was the acquisition of the troubled thrift.[49] And, in one of the many briefs in

---

There is no cross-reference here. Reconciling two possibly inconsistent provisions—the long-term amortization of goodwill in the forbearance letter (incorporated into the RCMDA) and the definition of regulatory capital, the Eleventh Circuit in *Guaranty* "interpreted the long-term amortization permitted in the forbearance letter as an exception good for as long as the regulatory environment did not change, but servient to the 'risk-shifting' article." 409 F.3d at 1369.

> The agencies ... granted Guaranty an exception to the rules of the game, and promised that the exception would be valid so long as the rules stayed the same. But the agencies, at the same time they made that promise, also unambiguously warned Guaranty that the rules might later change to Guaranty's detriment. By signing the contract, Guaranty took that chance, in effect wagering the chance that the rules would be changed against the potential return if they were not.

*Id.*

48. "[T]he Holding Company Application regarding the acquisition of control of the New Institution and the Old Institution as a result of that merger is hereby approved; provided that the following conditions are complied with to the satisfaction of the Supervisory Agent[.]" (PX 338 at 000117.) Although several conditions are then specified (including an accountant's opinion that describes the intangible assets acquired by the thrift in the acquisition "including goodwill" [PX 190 at 000118] ), the signing of an agreement to maintain capital was not among them.

The Secretary or an Assistant Secretary of the Board was authorized and directed to issue the Forbearance Letter effective upon the merger. (PX 190 at 00120.) However, the direction and approval were absolute. If any of the conditions subsequent failed, "[a]ll approvals given under this letter and concurrent letters, if any, shall be cancelled and withdrawn[.]" (PX 190 at 000120.)

49.
> Q: Now with respect to the actual closing of the transaction, you don't remember any document in which the Federal Home Loan Bank of Dallas or the Federal Home Loan Bank Board set forth the mechanics of how closing should occur, is that correct?

this case, the government explained that the RCMDA was a regulatory requirement: "[T]he [RMCDA], while not a contract, is at least signed by both the FSLIC and [the Holding Company] (by Hughes) and places specific obligations on [the Holding Company]. The execution of the RCMDA was mandated by the regulations governing the FHLBB's approval of plaintiffs' application for supervisory conversion and merger and was signed on May 27, 1988, two weeks after the issuance of the forbearance letter." (Def.'s Reply in Support of its Cross–Motion for Summary Judgment Against Hughes and [the Holding Company], filed February 21, 2001, at 23.)

*Admiral III* has been applied to foreclose all recovery. In *Coast–To–Coast III v. U.S.*, 62 Fed.Cl. 469 (2004), unlike the case here, the forbearance letter contained successor regulation language.[50] *First Commerce Corp. v. United States*, 63 Fed.Cl. 627 (2005), also granted a motion for reconsideration, setting aside its prior opinion to the contrary, and dismissed based on the successor regulation language in the RCMDA signed by the parties. *See also, Bayside Fed. Sav. & Loan Ass'n v. United States*, 64 Fed.Cl. 15 (2004) (applying *Admiral III* where both applicants signed the RCMDA).

A condition precedent to the transaction in this matter was the extension of supervisory goodwill, amortized over up to twenty five years. That forbearance was granted in the May 13, 1988 approval by the Bank Board. (PX 338 at 10.) In the Forbearance Letter, the Bank Board reserved its right to take authorized action(s) against the newly-formed thrift except for the regulatory requirements waived including paragraph 3, the amortization of supervisory goodwill. "This letter does not and shall not be construed to constitute forbearance or waiver by the Board or the FSLIC with respect to any regulatory or other requirements other than

those encompassed within the preceding paragraphs (1) through (6) and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Board and the FSLIC expressly reserve all their statutory rights and powers." (PX 336 at 2.)

Furthermore, the limited successor regulation language in the Approval Letter here is not consistent with the government's position. The section of the eleven-page Approval Letter granting FSLIC insurance to the new thrift is subject to several conditions including the infusion of the properties with $35 million of equity. Another condition is "[t]hat the new Institution [ ]comply with 12 C.F.R. §§ 562.9 and 563.16 **or any successor regulation**." (emphasis added.) The regulations cited are limited and do not include regulatory capital ("[e]ffective date of insurance; initial premium payment; issuance of certificate of insurance" and "[p]remiums in mergers, consolidations, or purchases of bulk assets" respectively). The Approval Letter qualified one condition by placing the risk of regulatory change on the acquirer. The forbearance grant to New El Paso was unqualified. The government points to no provision signed by Hughes in his individual capacity to "over[come] the presumption that the promises contained in the forbearance letter were absolute." *Franklin Fed.*, 431 F.3d at 1369.

Hughes did not sign the RCMDA in his individual capacity. As the Federal Circuit recently differentiated, those who promise to maintain or guarantee capital levels, or contribute if capital falls below a certain level, do not have either the contractual rights or remedies of the parties to the underlying acquisition agreement. *See S. California Fed. Sav. v. United States*, 422 F.3d 1319, 1333–34 (Fed.Cir.2005). In the RCMDA in *Southern California* individuals agreed to in-

A: I don't recall anything like that.
Q: You don't recall seeing any document containing instructions or guidance with respect to closing, correct:
A: Correct.
(Tr. at 5791.)

**50.** "In the event any regulation or statute referred to herein is amended or succeeded by

another statute, regulation or rule, then any reference to any such regulation or statute shall be deemed to refer to such regulation or statute as amended or the statute, regulation or rule which succeeds any such regulation or statute." *Coast–To–Coast Fin., Corp. v. United States*, 58 Fed.Cl. 327, 332 (2003).

fuse an additional $5 million if the thrift's regulatory capital fell below required levels. The Federal Circuit parsed the RCMDA as separate from the other contractual documents, declining to extend to the individual plaintiffs standing under the Assistance Agreement for breach of the promised contained therein. Conversely here, any waiver by the Holding Company in the RCMDA does not flow upward.

The two documents, while each part of the over-arching contract involved here comprising numerous documents, are separate. Accordingly, one must interpret two separate documents in this contractual melee.

It is important to note that even though several instruments relating to the same subject and executed at the same time should be construed together in order to ascertain the intention of the parties, it does not necessarily follow that those instruments constitute one contract or that one contract was accordingly merged in or unified with another so that every provision in one becomes a part of every other.

*Franklin Fed.,* 431 F.3d at 1371 n. 8 (citing *Williston on Contracts* § 30:26 (4th ed.1990)).

The Forbearance Letter granting the amortization of supervisory goodwill was unqualified. With the exception of those specified forbearances, the FHLBB reserved all their statutory rights and powers. If possible, contracts are construed to give effect to all provisions, even potentially conflicting sections. "The principle that a contract is construed to give effect to all of its provisions does not exempt contracts with the United States." *First Nationwide Bank v. United States,* 431 F.3d 1342, 1347 (Fed.Cir.2005) (citing *Tecon Corp. v. United States,* 188 Ct.Cl. 15, 411 F.2d 1262, 1264 (1969) ("A construction of a contract provision which gives meaning to all its language is to be favored.")); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 979 (1965) ("Also, an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous."); *see also United States v. Johnson*

*Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir. 1983) ("[A]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions ... meaningless; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible.") (cited in *Westfed Holdings, Inc. v. United States,* 407 F.3d 1352, 1359 (Fed.Cir. 2005)). Thus it is concluded that Alfred J. Hughes in his individual capacity did not assume the risk of regulatory change and, as a party to the acquisition contract, remains in a status to receive compensation for the contributions he contracted to make and that were made in reliance on the goodwill forbearance.

### CONCLUSION

Accordingly, based on the foregoing:

(1) The government's Renewed Motion for Summary judgment dismissing the claims of El Paso Holding Corporation shall be **GRANTED** so that those claims are **DISMISSED**;

(2) The Clerk of Court shall **ENTER** final judgment in favor of Alfred J. Hughes in the sum of $46.5 million;

(3) All other pending motions are **DENIED** as **moot.**